Madben, Judge,
delivered the opinion of the court:
On June 11,1945, the plaintiff entered into a contract with the United States, represented by the U. S. Engineer Office of the War Department, to lease the plaintiff’s dredge, the George A. McWilliams, with all necessary operating personnel and attendant plant to do dredging on the Mississippi River at any point from Cairo, Illinois, to the mouth of the river. Payment for the use of the dredge was to be at specified rates per hour. The specifications contained pertinent provisions as to what should constitute pay time. The dispute in this case is as to whether the plaintiff is entitled to be paid for a period of ten and one-half hours on October 19, 1945, which period was spent in laying some 1,200 feet of shore pipeline in preparation for dredging in a new location.
The dredge had been operating for some weeks on the Kentucky side of the channel of the Mississippi in what was known as the Wolf Island Bar project. In this project two cuts were to be made, No. 1 being on the Kentucky side, and No. 2 on the Missouri side. The cuts were to be parallel and adjacent, each being 300 feet wide. Cut No. 1 began upstream and the dredge moved downstream, a length of 3,800 feet. The spoil from Cut No. 1 was deposited on the Kentucky side of the river through a floating pontoon pipeline, with very little line laid on the shore.
On October 12, it being apparent that dredging in Cut No. 1 would be completed within a couple of days, the Government’s Chief Inspector on the project directed the plaintiff to lay a shore pipeline at a point on the Missouri shore at the upper end of what was to be Cut No. 2. The plaintiff’s dredgemaster said he would do so. On October 14 the matter was discussed again and the dredgemaster said he would place the shore line when he got around to it — that he did not have sufficient labor at that time.
Dredging in Cut No. 1 was completed at 7:20 P. M. October 14. On October 15 the dredge moved to the new location, the upstream end of Cut No. 2. At the plaintiff’s request the dredge was shut down for repairs on October 16, until 6:45 P. M. October 16. At that hour dredging began, *14 and consisted in the deposit of the dredging spoil to construct a ramp leading from the cut through the shallow water to the river bank. As the ramp was built, pipe was laid on it, the length of the ramp being 800' feet. Those operations continued until 9:30 A. M. October 19. The plaintiff was paid for that time. At that hour, the laying of the 1,200 feet of shore pipe from the shore end of the ramp to the place where the spoil was to be deposited began, and continued until 8:00 P. M. on that day, a period of IO14 hours. The Government refused to pay the plaintiff for those hours, and the plaintiff sues here for $992.25 which is the correct amount if the time was, under the contract, pay time.
The plaintiff points to the following provision of the specifications, which is a part of what we have quoted in our finding 4, entitled SC-3 (b) and includes in pay time
2. * * * actual time of moving from one job to another and from one location to another on the same job at the direction of the Contracting Officer, such time to be computed from the time of shutting down * * * preparatory to move to time when dredge and pipeline are in position for dredging at new location; except when through the negligence of the Contractor part of the necessary equipment needed at the new location is not available as in the case of broken or disabled pontoons, lack of self propelled plant to set up the pipelines, etc. * * *
That provision seems to say rather plainly that the time spent in laying pipe line at the new location after shutting down the preceding operation is pay time.
The Government points to another provision of the specifications SC-3 (d) also quoted in finding 4, which says that' payment will not be made for
1. Lay time * * * after arrival at location of a new project * * * when through negligence of the Contractor the necessary equipment is not available or in operating condition at the new project. * * *
We think that this is merely the statement of the negative of what we have quoted above as defining pay time, and does not change its meaning. The reference to necessary equipment being “not in operating condition” can hardly refer to unlaid shore pipe, in view of the positive statement above *15 that pay time shall include the time from shutting down the former operation until “time when dredge and pipe line are in position for dredging.”
The Government points also to specifications SC-7, quoted in finding 4, which says
(d) Control. — 1. The entire plant shall be under the control of the Contracting Officer, or his representatives, with regard to the hours of work, location of work, work to be done, type impeller used, etc.
This statement is very general, but it does not mean that the contracting officer could, contrary to the terms of the contract, require the contractor to detach auxiliary equipment or a part of the crew to do nonpay work when to do so would, create a danger that the pay work of dredging might be interrupted.
We see no reason why the plaintiff should have had to maintain an unnecessarily large crew while it was operating in Cut No. 1, where it used very little shore pipe, in order to be ready on short notice to lay and operate the long shore pipe which the contracting officer directed on October 12 for Cut No. 2. Its crew at the time was adequate to maintain full production. To obtain the necessary additional men naturally took some days. The fact that if the shore pipe had been deposited on the Missouri shore within two or three days after October 12, the water level would have been high enough so that it could have been carried over the water to the shore, instead of over the subsequently built ramp, is irrelevant. It is not claimed that the drop in the water level was foreseeable, and, in any event, it would seem not to have been practicable to obtain the additional crew in so short a time. When the water level had gone down, by October 16, it was, apparently, not possible to deliver the pipe to the shore until the ramp was completed. It was laid within a few hours after that was done.
We have quoted, in finding 4, Article 8 of the contract, placing in the contracting officer the power to decide disputes concerning questions of fact, subject to an appeal to the head of the department. The contracting officer rejected the plaintiff’s claim. An appeal was taken to the head of the department, the Secretary of War. The Army Board of *16 Contract Appeals, which, had been authorized by the Secretary of War to act in his stead in such cases, affirmed the decision of the contracting officer, with six members concurring and three dissenting.
The Government urges that the decision of the Army Board of Contract Appeals, made on behalf of the Secretary of War, is final. The decision hinged principally upon the interpretation of language in the specifications of the contract. In the case of Martin Wunderlich v. The United States, No. 46307, decided today, we have reaffirmed our view that questions of the interpretation of contracts are not “questions of fact” within the meaning of that expression as it is written into the disputes articles of Government contracts. We will not repeat here the considerable discussion devoted to the question in the Wunderlich case.
The Army Board of Contract Appeals in interpreting the contract in the instant case, did not purport to be acting under the disputes article of the contract. In its decision,. BCA No. 1477, Supplemental Opinion, at page 50 of the plaintiff’s petition herein, the Board says:
Exercising its jurisdiction to determine the facts under the appeals provision of the contract, and also to interpret the provisions of the contract under authority of Memorandum of the Secretary of War dated 4 July 1944, the Board finds * * *.
The memorandum cited gave to the Board the power to, inter alia:
(b) Consider and administratively pass on appeals not specifically or impliedly authorized by the contract where the ruling appealed from is not thereby made final and conclusive, and the appeal is taken within the time fixed in the contract for appeals.
It is evident that the Secretary was authorizing the Board to act for him in the way that any owner would act if a contractor was dissatisfied with the way he was treated by the owner’s representative in charge. He would listen to the contractor’s story, and if he thought that his representative had been unfair, he would reverse him. He would do this, not because the contract gave him any authority to make a final decision which would bar the contractor from relief in *17 the courts for breach of contract, but because it would be the natural and fair way for an owner to act. And just as the contractor in the supposed case could sue for breach of contract if his appeal to the owner did not give him satisfactory relief, so can the contractor with the Government, if he has not contracted away his right to do so. Our interpretation of the Secretary’s Memorandum of July 4,1944, is confirmed by statements of the Board set up by him. In Appeal of Robert E. McKee, BCA No. 1617, the Board said, “The dispute in this appeal centered around the interpretation to be given to paragraph 84-12 of the specifications which provided as follows * * In its decision it said
The question of interpretation involved in this appeal is one of law, not one of fact as required by the provisions of the original “Disputes” article pursuant to which this appeal was taken. Appeals of W. F. Trimble and Sons Co., BCA No. 27, ICCF 47 (1944) and N. G. Petry, BCA No. 498, 2 CCF 372 (1944). This Board has the authority, however, to decide administratively the merits of the present appeal as provided in the memorandum of the Secretary of War dated 4 July 1944. Appeal of Peter Kiewit Sons Co. et al., BCA No. 717, 2 CCF 981 (1944).
And in Appeal of S. K. Jones Construction Company, BCA No. 1619, decided February 6, 1948, the Board said:
The remaining contention of the appellant, that the assessment of the excess engineering and inspection costs could not be made under the provisions of the contract, does require an interpretation of the contract provisions. It is, therefore, one of law. The contract does not provide for an appeal on a question of law to this Board. Under the authority of the memorandum of the Secretary of War of 4 July 1944, however, this Board has the authority to consider and administratively pass on appeals not specifically or impliedly authorized by the contract. To such an extent the Board has jurisdiction to pass upon this issue.
Our conclusion is that the plaintiff is entitled to a judgment for $992.25.
It is so ordered.
Howell, Judge; Whitakek, Judge; Littleton-, Judge; and Jones, Chief Judge, concur.