JOHN A. JOHNSON CONTRACT-
ING CORP.

v.

The UNITED STATES.

No. 47607.

United States Court of Claims.
July 12, 1955.

Max E. Greenberg, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff, on December 15, 1942, made a contract with the Government, which acted through the War Department's Corps of Engineers, to construct the U. S. Army General Hospital at Utica, New York. There were to be 122 buildings, with connecting enclosed walkways, and the contractor was to install all utilities, place the surfacing on the roads, and do the finished grading and seeding of the grounds. The Government was to furnish various items of material which would be incorporated in the structures. Other items, including lumber and nails, were to be obtained by the plaintiff from sources and through allocations to be designated by the Government.

The work was divided into four groups, one group to be completed by each of the following dates: March 1, March 15, April 15, and May 15, 1943. Especially in view of the extreme cold weather which prevails in the area, the completion of the work within the specified times was hardly to be expected, though it was not impossible.

The whole project had been thought up in a hurry, in the fall of 1942. The site selected was a sloping hillside, with a drop of some 50 feet in elevation in the 2,000 feet of its north to south dimension. The plan called for terracing the hillside and for placing roads and buildings on a succession of levels. In order to get the work started, a contract for the grading for the roads and terraces, the construction of the roads, except for their final smooth surfacing, and the construction of the drains, was let to the Winkleman Company on November 4, 1942, which was before the plans for the buildings had been completed. Winkleman's work was to be completed by December 5, subject to the usual provisions about excusable delays. Winkleman was delayed by wet weather. Priority was given to the construction of roads, which involved the making of cuts and fills. The fills were placed on wet ground, the earth placed in the fills was wet, and there were drenching rains while the work was being done. The ground froze at night and some frozen ground was placed in the fills. A 12-inch course of bank gravel was placed by Winkleman on the roads, but, as we have said, the final smooth surface of the roads was to be placed by the building contractor after the completion of the buildings.

When bids for the construction of the hospital were invited, the plaintiff's representatives visited the site, on December 10 and 11, 1942, and observed but paid no particular attention to the road and grading work which was in progress.

Both parties assumed that the plaintiff would use the roads, as constructed by Winkleman, as haul roads in connection with its building operations.

On December 21, 1942, the plaintiff was given notice to proceed. By that time Winkleman had completed the grading of 41 building sites, and was still working on the roads and the grading, and continued to work through January

and until February 27, 1943, when that work was suspended because of the cold weather. By the time of the suspension, all the main access roads and most of the drainage ditches were built.

During January and February the ground froze so hard that trucks could travel anywhere on it. Holes for foundation piers for the buildings had to be dug, but the digging was difficult and expensive because of the frozen ground and the plaintiff did not place as many piers as it might have. The same was true as to the digging of trenches for the placing of pipes for the utilities. The plaintiff anticipated, probably with reason, that much of the work would not in any event be completed before spring, and it therefore sought to avoid the expense of digging in the frozen ground. There had also been delays in the furnishing of materials to be furnished by the Government, or to be obtained upon Government allocation.

By March 10, the plaintiff was getting ready for the big push toward getting the job forward. Heavily loaded trucks were moving lumber on to the site in great volume. Surveys had been made for the utility trenches and equipment to dig them was available. On March 11, the spring thaw began, some weeks earlier than usual. There was rain, off and on for several days. The heavy hauling continued, and within a week or ten days after March 11, the whole road system disintegrated. Trucks sank in the mire to the cab. Tractors, sent to pull out the trucks, had to be pulled out by caterpillars. What happened to the roads was that, as the frost came out of the ground, the moisture, because of the depth to which the ground was frozen, could not drain downward, hence it was carried toward the surface by capillary action. It thus soaked the soil under the 12-inch gravel course of the roads, and the loads crushed the gravel into the mud. The fact that the earth bases under the gravel had been wet and frozen when the gravel was placed, the fact that the drainage ditches at the sides of the road were not adequate, and had in some instances been obstructed by the plaintiff, and the unusual capillarity of the soil, all made their contribution to the collapse of the road system. The only thing that would have saved the roads would have been to keep loaded vehicles off them for several weeks. Neither party even seriously thought of doing that. Both were intent on getting the work forward. The contracting officer took the position that it was the plaintiff's responsibility to keep the roads passable, or to get its work done somehow. The plaintiff's position was that the failure of the roads was a breach of contract by the Government, for which the plaintiff would make a claim.

At very great extra expense, by unloading, hand handling, hauling in brickbats, slag, and cinders, miring down and digging out, placing equipment on pontoons, the work proceeded, greatly delayed, of course. After the frost was out of the ground the month of April was wet and cloudy, and May and June were rainy. The site did not dry out enough for grading operations to be resumed by Winkleman until July.

On April 19, 1943, the plaintiff notified the Government that a formal claim would be filed. It filed such a claim on May 24. In the statement the plaintiff said, among other things, that it had "encountered unforeseen conditions beyond its control and not due to its fault or negligence." It requested the contracting officer to make findings of fact and presented 122 proposed findings of fact in separate, numbered paragraphs.

On July 5, 1943, the plaintiff filed a supplementary statement. This and the earlier statement, considered together, gave adequate notice to the contracting officer that the plaintiff was asking for compensation for the expense incurred because the plaintiff had "encountered unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications." Article 4 of the contract provided for additional compensation in such a situation.

On October 19, 1943, the contracting officer denied the plaintiff's claim. He did not make findings of fact with regard to the plaintiff's claim that it had encountered unknown conditions, and apparently gave no consideration to that claim. On November 16, 1943, the plaintiff appealed the decision of the contracting officer to the Secretary of War, stating that the appeal was made pursuant to Article 15 of the contract. That article provided that the contracting officer was authorized to decide all disputes concerning questions of fact, subject to a right in the contractor to appeal to the Secretary of War, whose decision, or that of his representative designated by him to hear the appeal, should be final.

On December 13, 1945, the War Department Board of Contract Appeals, which had been designated by the Secretary of War to hear such appeals, made its decision. It denied the first three of the plaintiff's claims and dismissed the other seven. Its dismissal was on the ground that the last seven claims were claims for unliquidated damages based upon an alleged breach of contract, the failure of the road bases and drains, and that Article 15 did not authorize the contracting officer or the board to decide claims for unliquidated damages for breach of contract.

The Board, in its opinion, in taking jurisdiction of the first three claims, said that they were claims on account of changes, within Article 3 of the contract, or for changed conditions, within Article 4. Article 4, whose title is "Changed Conditions" is the article relating to unknown and unanticipated conditions. The Board said that "the acts of the appellant, in substantial part, caused the almost total failure of the roads and drains thus necessitating the * * * work" for which the claim was made. In its "decision" which followed its factual summary, the Board said:

"It cannot be said that the work forming the basis for the instant claims was necessitated by or the result of 'Changes', 'Changed Conditions', or 'Extras' within the pur-

view of the contractual provisions relating to these subjects."

Public Law 356, approved May 11, 1954, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322, provides as follows:

"Finality Clauses in Government Contracts

"An Act

"To permit review of decisions of the heads of departments or their representatives or boards involving questions arising under Government contracts.

"Sec. 1. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That no provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"Sec. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative or board."

The instant suit, because it was pending at the time of the enactment of Public Law 356, is governed by that statute.

As we have said, the contracting officer, in denying the plaintiff's claim, made no finding about or mention of unknown or unforeseeable conditions though the plaintiff had, in its written statement of claim, asserted that it had

suffered damage as a consequence of such conditions.

We think it is beyond dispute that conditions unforeseen by the parties to the contract were encountered. If the Government foresaw, and the plaintiff should have foreseen, that materials could not be hauled over the roads on the site of the contract during the long period of the spring thaw in the cold climate of Utica, the completion dates fixed in the plaintiff's contract, for work to be commenced on December 15, 1942, were wholly beyond reason. Those dates, for the four divisions of the work, were March 1, March 15, April 15 and May 15, 1943. As it turned out, after the beginning of the spring thaw on March 11, the site did not dry out enough to permit grading operations to be resumed until July. None of the four divisions of work was completed before September.

The contracting officer's decision, and the Government's present position are based largely upon the assumption that it was the plaintiff's responsibility to provide its own roads; that its being permitted to use the roads which the Government had caused to be built was merely an accommodation. But the bids for the plaintiff's contract were not opened until December 14, 1942. It is unthinkable that the plaintiff was expected to build, within the limited site, a network of construction roads duplicating those that were then being built by another contractor, and make those temporary construction roads so much better than the permanent roads that they would carry heavy traffic during the spring thaw. That it was expected that building construction work would be suspended during the spring thaw has not been urged and cannot be urged. The time limits for completion show that the plaintiff never thought it had the right to suspend the work, and the contracting officer was constantly pressing for more rapid progress.

■■■ We have found that the disintegration of the roads might not have been as complete, if the plaintiff had conducted its operations differently. We

have taken that fact into consideration in assessing the damage suffered by the plaintiff. But we have found that the roads, as designed and built, were, in the unforeseen conditions that actually developed, wholly inadequate for the purpose for which they were expected to be used by the plaintiff.

■■■ The Board of Contract Appeals of the War Department, to which the plaintiff appealed from the adverse decision of the contracting officer, also made no finding and no statement in its opinion as to the existence of unforeseen conditions, except the following:

"It cannot be said that the work forming the basis of the instant claims was necessitated by or the result of 'Changes', 'Changed Conditions' or 'Extras' within the purview of the contractual provisions relating to these subjects."

The Board devoted its discussion to the problem of whether the Government had been negligent in not building better roads, and whether it had warranted that the roads which it furnished would be usable. Those matters are beside the point when a claim of unforeseen conditions is made. The contract provided that if there were unforeseen conditions, an equitable adjustment would be made to compensate for the expense resulting therefrom. The liability is contractual, and does not depend upon negligence, or a culpable failure to perform an agreement.

As to changed, or unforeseen conditions, then, we have nothing from the contracting officer, and nothing from the Board except its *ipse dixit* that there weren't any changed conditions. We think the Board's failure to discuss the question was largely due to what we have found to be a misinterpretation of the contract, with reference to the expectation of the parties that the plaintiff would use the existing roads.

The opinion of the Board shows the first three items of the plaintiff's claim as follows (finding 45):

"Item I. Reconstruction and stabilization of road bases.

"Item II. Reconstruction and maintenance of drainage ditches and culverts.

"Item III. Regrading terraces and slopes."

The Board said (finding 46):

"The Board is of the opinion that it was appellant's responsibility, under the contract * * * to do the work embraced in Items I, II, and III. * * * the evidence justifies the conclusion that the acts of appellant, in substantial part, caused the almost total failure of the roads and drains, thus necessitating the large amount of such work."

We think the Board misconstrued the contract in concluding that it was the plaintiff's responsibility to reconstruct and stabilize the road bases at its own expense, no matter how unforeseeable their failure may have been. As we have said, the parties contemplated the use of the road bases for construction roads, and did not contemplate their failure if they were so used, with a reasonable amount of maintenance. The parties did not contemplate that, for the long period of the spring thaw, which came some twenty days earlier than the Government expected, nothing but light loads should traverse the roads. The Board's misconstruction of the contract is shown by its statement, in this connection, that the plaintiff was under a duty to provide its own construction roads. See finding 46.

The Board says that the plaintiff's own acts, in substantial part, caused the failure of the roads. We, too, have found that the plaintiff could have by more careful maintenance of the roads, minimized its damages. But that fact did not authorize the Board to place upon the plaintiff's shoulders all the rest of the damage which could not have been avoided except by closing down the project.

It may well be that the failure of the Board to give adequate consideration to the question of unforeseen conditions was due to the fact that the Government's attorney, on the one hand, was urging that the plaintiff was using the existing roads only by the grace of the Government, and with complete responsibility to maintain and restore them, while the plaintiff was urging that the Government had impliedly guaranteed to supply a usable system of roads. No fault is imputed to the Board in failing to see that the real problem, under the contract, was one not urged by the parties. It was whether the disastrous failure of the roads was an unforeseen event from the expense of which the contractor was entitled to be relieved by the application of Article IV. The plaintiff's failure to analyze with greater nicety the appropriate theory for its claim should not have the effect of a forfeiture of its rights. Its assertion that the Government had warranted the usability of the roads was not essentially different, when coupled with its assertion that unforeseen conditions had been encountered, from a claim based solely on the unforeseen conditions. The measure of its compensation would have been the same on either basis. The Government's attorney before the Board, and the Board itself, would have been more familiar with the plaintiff's complex, Government-written contract than plaintiff's counsel was.

The interpretation of the contract, which was the key to the Board's decision, was not a question of fact on which the Board's decision was final, under the contract. McWilliams Dredging Co. v. United States, 118 Ct.Cl. 1, 16. The Board itself is of that opinion as the references in the McWilliams case show. Public Law 356, hereinbefore quoted, in its Section 2 forbids the insertion in Government contracts of a provision making final an administrative decision of a question of law. Congress undoubtedly used the expression "question of law" with the meaning that was universally attached to it, that is, that it included a question as to the interpretation of a contract.

On the whole, on this phase of the case, we think that, so far as a question of fact was involved, there was no

substantial evidence that the parties foresaw that a considerable part of this big construction job would have to be performed in a quagmire. But the real foundation of the Board's decision was its erroneous conclusion as to the interpretation of the contract. Pursuant to the provisions of the contract and of Public Law 356, we have the question for decision. Our decision is that the plaintiff is entitled to recover the expenditures reasonably and naturally flowing from its encounter with these unforeseen conditions. We have found that those expenses amounted to $310,000.

After it had filed its claim with the contracting officer, the plaintiff continued with its work. On May 18, 1943, it requested extensions of time, and on June 7, the contracting officer extended the time for completion of all four groups of the plaintiff's work to June 30, on account of unusual weather, delays in delivery of Government-allocated and Government-furnished materials, and a critical shortage of labor. At the time of the granting of this extension, the contracting officer did not expect that the work on the buildings, which comprised Groups 1, 2, and 3 of the plaintiff's work could be finished by June 30, and knew that the Group 4 work, road surfacing and final grading, could not be done until the building work was completed. The June 30 date was apparently set with regard to the close of the fiscal year on that day.

Not until the end of June was the ground dry enough for the work of placing topsoil and seeding, and road surfacing. Winkleman, the contractor for rough grading, had been delayed as was the plaintiff, and some of that work was still not done when July 1 came. The plaintiff and Winkleman got in each other's way. There were heavy rains in July and August, and because of faulty setting of grades by the Government's agents, water ponded under some of the buildings and buckled the floors. In between rains, the dust caused by the work on the site became a nuisance.

In the Army's chain of command in the area, the Commanding General of the Second Service Command was at the top. At the hospital itself the senior medical officer was in command, and had authority over the officers of the Corps of Engineers who were building the hospital. The senior medical officer had been in Utica during the cold of the winter, the mud of the spring, and the dust of the summer. He was under pressure from above to get the hospital completed. During June and July, medical supplies and hospital equipment were moved into some of the buildings. Early in August the first trainload of wounded soldiers arrived at the hospital. In that month the question of further extensions of time for completion of the plaintiff's work came up. Under the Army chain of command, the contracting officer was required either to obtain the approval of the commanding officer of any extension which he proposed to make, or to submit the recommended extension to higher authority. The contracting officer requested the approval of the commanding officer, the senior medical officer, for an extension of the plaintiff's time for the completion of the Group 4 work, which was the road and final grading work.

The commanding officer was disgusted with the situation, thought the drainage arrangements were inadequate, and demanded that the Corps of Engineers terminate the plaintiff's right to proceed, take over the work themselves or get someone else to do it, and, in so doing, overhaul and amplify the drainage system. Plans were drawn accordingly, which increased the capacity of the drainage system, added to it culverts, catch basins, and riprap, and called for some additional roads. Under these plans the continuation of work by Winkleman under the revised plans, and by the plaintiff under its original plans, would have resulted in extensive duplications and additional costs. The contracting officer decided that one contractor should perform all the work under the revised plans, and also all the un-

completed work of both the plaintiff and Winkleman under the original plans, so far as that work had not been affected by the revised plans. He decided to terminate the plaintiff's contract as to the Group 4 work, and give all the work described above to Winkleman.

The plaintiff was notified of this action on August 21, 1943. It was told to make a survey of the work it had done on Group 4 items and that it would be paid for that work. At that time the contracting officer intended to terminate the plaintiff's Group 4 work for the convenience of the Government, and had no thought of charging the plaintiff for the excess cost of getting the work done by someone else. However, the contracting officer was advised by Government lawyers that if he terminated the plaintiff's contract and had another contractor complete the work, and did not back-charge the plaintiff with the excess cost of the work, legal complications would result. The contracting officer for that reason, on August 28, 1943, formally notified the plaintiff that its Group 4 work was terminated under Article 9 of the contract because of delay by the plaintiff in the progress of the work.

The Group 4 work was completed in due course by Winkleman, at unit costs which were reasonable but were greatly in excess of those specified in the plaintiff's contract, and the plaintiff was charged with the excess.

On September 12, 1943, the plaintiff requested extensions of time for all groups of its work. As to Group 4, it asked for an extension to August 24, the day on which it was notified to stop that work. If that extension had been granted, it would seem to have meant that the plaintiff was not in default when the work was terminated on the stated ground that it was in default. The contracting officer, on February 8, 1944, extended the time for the Group 4 work, which had formerly been extended to June 30, only to July 30. As to the plaintiff's building operations, its time was extended to the actual completion dates in September and October.

On March 8, 1944, the plaintiff appealed from the contracting officer's decision as to extensions of time to the Secretary of War. On May 10, 1944, the plaintiff protested to the contracting officer his action in backcharging to the plaintiff the excess costs of completion. On June 17, the contracting officer denied the protest. On July 15, the plaintiff appealed this decision to the Secretary of War. After each of the foregoing appeals the contracting officer made detailed findings of fact which were in the nature of the brief of an advocate opposing the plaintiff's appeal. On December 14, 1945, the War Department Board of Contract Appeals denied the plaintiff's appeals.

■ The action of the contracting officer on these two problems was vulnerable in two respects. As to the denial of the extension of time, he did not himself decide the question. He had intended to grant the extension, but abdicated his contractual responsibility to the commanding general. His action in terminating the Group 4 work for delay did not represent his judgment as to the merits of the case, but was a device to satisfy what lawyers told him were, or probably were, the legal requirements of the situation.

Article 15 of the contract provided that disputes, arising under the contract, concerning questions of fact, should be decided by the contracting officer, with the right in the contractor to appeal to the Secretary of War. Whatever may have been the chain of command in the Army's organization, the contract entitled the plaintiff to a decision by the contracting officer, and not by him or a superior who chose to supersede him for the occasion. The commanding officer, who made the decision which was signed by the contracting officer, reached his conclusion largely for the reason that the drainage system as originally designed was inadequate. That, of course, was not the responsibility or the fault of the plaintiff.

Except for the redesigning of the work by the Government, which created overlapping and confusion of the plaintiff's

work with that of Winkleman, there was no reason why plaintiff was not entitled to an extension of its Group 4 work commensurate with the extensions which it was given on its other three groups of work. Those extensions were, presumably, given for the same reasons as the earlier and admittedly inadequate extensions of all four groups of work, viz., unusual weather, delays in delivery of Government-allocated and Government-furnished materials, and a critical shortage of labor. Besides, it was impossible to complete the Group 4 work, road surfacing and final grading, until the building construction covered by the other groups of work was completed.

When it was decided to redesign the drainage system, the Government had a right to give the additional work to whom it pleased, and it decided to give it to Winkleman. Having given it to Winkleman, it decided, reasonably enough, that to have two contractors working simultaneously on grading, often at the same places, would be confusing and expensive, and that it would be to the convenience of the Government to terminate the plaintiff's Group 4 work. The Government had the right to do that, paying the plaintiff for what it had done. The contracting officer decided to handle the matter in that way and so orally advised the plaintiff. Then the Government's lawyers advised the contracting officer that unless he terminated the plaintiff's contract for the plaintiff's fault, thereby laying the basis for charging the plaintiff with the excess costs of having the work completed by another contractor, legal complications might ensue. For that reason the contracting officer charged the plaintiff with unjustified delay, and placed the termination on that ground.

The contract required the contracting officer's decision on questions of fact. It did not contemplate that his decision would be shaped by ulterior motives, looking toward the possible or probable legal consequences of that decision.

The purported decision of the contracting officer denying the plaintiff an extension of time, and terminating the contract for the plaintiff's fault, was a nullity. As to one aspect, it was not his decision, and as to the other, it was a decision arrived at for an irrelevant reason. Yet his decision went, on appeal, to the Board of Contract Appeals, clothed, presumably, with some presumption of correctness, because of his competence and his intimate knowledge of the facts. The interposition of the commanding officer and the Government lawyers into the situation, which nullified the contracting officer's decision, were, so far as appears, not known to the plaintiff or to the Board. They were disclosed upon the trial of the case in this court. Whatever justification there may have been for the Board's decision upon the basis of the facts known to it, we feel certain that if it had had the evidence which we have, and which was in the possession of the Government and unknown to the plaintiff, it would have remanded the case to the contracting officer for a decision properly arrived at. That decision, presumably, would have been the one that he intended to make before he was overruled by the commanding officer and influenced by the lawyers.

The plaintiff's Group 4 work was, in fact, terminated for the convenience of the Government. The Government had, therefore, no right under the contract to charge the plaintiff with the excess costs of having it completed by another contractor. The plaintiff is entitled to recover $67,079.29 on the second item of its claim. Since it is entitled to $310,000 on the first item of its claim, it may have a judgment for a total amount of $377,079.29.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER, and LITTLETON, Judges, concur.