Pee Cueiam:
This case was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on April 10,1968, .in which necessary facts are set forth. Exceptions to the commissioner’s opinion, findings and recommended conclusion of law were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the commissioner’s opinion, findings and recommendation, with modifications, it hereby adopts the same, as modified, as the basis for its *401 judgment in this case as hereinafter set forth. Therefore, plaintiff is entitled to recover, as hereinafter set forth, with the present proceedings stayed for a period of 90 days under Rule 100 to permit further administrative proceedings in the Interior Department, leading to a determination of the amount by which the contract price should be equitably adjusted. Plaintiff shall comply with Rule 100 'and the General Order of April 1,1988.
Commissioner Spector’s opinion, as modified by the court, is as follows:
This is a contract claim growing out of 'an agreement between plaintiff and the United States Department of the Interior, National Park Service. The contract was dated January 28, 1958, and it was executed on a unit-price (estimated quantity) basis in the original estimated amount of $667,355. It provided for the replacement of an existing section of Route U.S. 441 where it crosses the Great Smoky Mountains National Park from Gatlinburg, Tennessee, to Cherokee, North Carolina.
The project was located in a park area featuring heavily wooded mountains. It consisted of construction of 3.893 miles of highway, descending generally from elevation 4,260 at the western end of the section to 2,740 at the eastern end, although attaining an elevation of approximately 1 mile above sea level at one point. The new highway followed alignments and grades that were separate from the old road, but crossed or impinged upon the latter at a number of locations. Involved were many cuts and corresponding fills in earth. It is the nature and properties of the soils encountered which for the most part underlies this dispute.
It is noteworthy that although executed by the Department of Interior, this contract was actually advertised for bids and fully administered by the Department of Commerce, Bureau of Public Roads, on behalf of Interior. Incorporated by reference are the provisions of the January 1957 edition of the “Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-57) ” issued by the Bureau of Public Roads. A regional engineer of that bureau administered the contract as authorized representa *402 tive of the contracting officer, an official of the National Park Service, Department of the Interior.
By letters dated April 27, 1960, and November 18, 1960, the plaintiff formally presented sis claims for additional compensation under the contract, totaling $893,137.26. About 2 years later, on June 1, 1962, they were denied in their entirety by decision of the aforementioned regional engineer of the Bureau of Public Eoads, and duly appealed within 30 days pursuant to the “Disputes” article contained in the contract. The appeal was to the Interior Department’s Board of Contract Appeals representing the Secretary of Interior. Some 3 years later, that board, with certain minor exceptions not pertinent here, also denied the claims in a decision dated November 16,1965.
As originally filed in this court, February 14, 1966, plaintiff’s petition sought recovery of $329,082.22 on the basis of four of the six claims above mentioned. In addition to attacking the finality of the board decision, the petition charged breach of contract based on unexplained delay in rendering a decision. Late in 1965, during this period of delay, the hearing member, who had observed the demeanor of the witnesses and viewed demonstrations and explanations not spread on the record, passed away, and the case was then decided 32 months after close of the hearing 'by three members of the board, two of whom were not members at the time of hearing. This, the petition charged, constituted a denial of due process. The case initially proceeded, without objection, toward a trial de novo in this court.
However, immediately following the decisions of the Supreme Court in TJtah and Grace, June 6, 1966,[1] this case took a different turn. Defendant successfully moved to vacate the court’s pretrial order under Eule 43 (e), and the parties were instead ordered to explore the relationship of the Wunderlich Act[2] to the relief sought. An assignment of er *403 rors procedure[3] was outlined for tbe guidance of the parties, and they were asked to define those areas not entitled to de novo trial, to distinguish decisions of fact from those of law, and to highlight in the record those conclusions of fact not supported when measured by the Wunderlich Act tests, and those conclusions of law deemed to be in error.
Plaintiff thereafter, and on June 21,1967, filed an assignment of errors which has served somewhat to simplify and to clarify the issues before the court. It urges that certain factual determinations by the Interior Board were arbitrary, capricious, and not supported by substantial evidence, and that certain conclusions of law were erroneous.
In addition, it contends that defendant breached the contract, but it does not seek a de novo trial on this account, relying instead on certain of the board’s factual determinations to support the contention that there has been a breach.
Finally, plaintiff withdraws all claims in its petition save that described in Count One and Count Two, both referred to in the record as the “wet soils” claim. Count One is predicated upon the “Changed Conditions” article in the contract[4] and on both aspects thereof, commonly characterized as “category one” and “category two” changed conditions, as follows:
* * * (1) subsurf ace or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the *404 site, of an unusual nature, differing materially from those ordinarily encountered ¡and generally recognized as inhering in work of the character provided for m this contract. * * *
Count Two of the petition, briefly summarized, alleges that defendant had in its possession information portraying the unusual characteristics of the subsurface soils at the project site, and withheld that information from plaintiff despite the brief period afforded for preparation of bids in mid-winter when soils were frozen and heavy snow covered the site, thus impeding plaintiff’s opportunity to discover this nondisclosure. Plaintiff charges that this constituted a misrepresentation and breach of contract.
On either count, plaintiff prays for judgment in the sum of $297,132.49, that being the same amount ascribed to Claim One of the six claims previously submitted for administrative determination.
Although the procedural permutations above outlined have served somewhat to simplify and clarify the issues before the court, they have also served to introduce certain complexities, ¡and formidable problems remain. These grow largely out of the fact that the “Disputes” article contained in this contract[5] accords limited finality solely to a “decision” on a dispute “concerning a question of fact” and no finality to a decision on a question of law. This is consistent with the Wunderlich Act[6] which provides that no Government contract “shall contain a provision making final on a *405 question 'of law the decision of any administrative official, representative, or board.”
As a result, the court is confronted with the vexing problem of determining whether the board’s decision concerns a question of fact, or one of law.[7] When, as most often occurs, the decision concerns an inextricably mixed question of law and fact, it is presumably necessary to determine whether the fact or the law ingredient is central and crucial to the decision, because of the contrasting finality tests applicable to each.[8]
These purported distinctions have plagued the law for centuries because law and fact do not stand independently of each other but rather act and react interdependently. “* * * The naive 'assumption that law and fact stand naturally apart draws attention away from the role that law plays in the selection and description of facts, and that facts play in impelling the adoption of rules and in limiting their scope of application.”[9]
Unfortunately, these are not the only threshold problems presented by this case. Defendant’s response to plaintiff’s assignment of errors argues, with respect to Count Two, that “In the final analysis, under the circumstances of this case no breach claim based on misrepresentation is available since this type of misrepresentation has been subsumed by the ‘Changed Conditions’ clause of the contract which provides for administrative relief when such misrepresentation in fact is found to exist. * * *” Count Two must therefore be measured against the opinion in the Utah decision to determine whether it describes a claim for relief within the coverage *406 of tbe “Disputes” clause and “redressable under other clauses of the contract.”[10]
Before confronting the foregoing threshold problems, it would undoubtedly promote understanding to recite the narrative and intermediate facts as to which the parties are essentially in agreement. The following narrative is in fact gleaned, in large part, from the board’s decision, and from the administrative record which plaintiff states “contains the necessary evidence to support the plaintiff’s contentions and to enable this Court to make final determination as to the issue of liability.” Defendant’s response to the assignment of errors, October 11,1967, also adopts “the factual background” contained in the board’s decision.
As previously indicated, the invitation for bids was issued in the winter of 1958 and 30 days later bids were opened. Within that 30-day period, Bolander Company obtained the necessary plans, specifications, and bidding documents. After a preliminary study, Mr. Bolander and an engineer in his employ traveled to the project site on or about February 16 and 17,1958, and promptly upon arrival, visited the Gatlin-burg office of the Bureau of Public Beads .to discuss the contract with Government personnel and to ask them for information concerning the job.
The board’s decision finds that “[i]n 1957, the Bureau of Public Boads had made 9 soil borings along the route of” the highway to be constructed. Three of these were not pertinent to this controversy. “The remaining sins” the decision finds, “disclosed information which would have caused a person shilled in soil mechanics to believe that the soil in the areas where the bookings were made would be difficult to handle when wet.” [Emphasis added.]
Nevertheless, the board concluded: “(i) that the Gatlin-burg office had a policy of making available any borings or other soil data in its custody to all prospective bidders who reguested such data; (ii) that appellant’s officials did not ash any of the personnel of the Gatlinburg office whether *407 soil borings bad been made or conld be seen; and (iii) that tbe personnel of the Gatlinburg office did not inform appellant's officials of the existence or availability for inspection of the soil borings previously made by the Bureau of Public Hoads." [Emphasis added.]
No information with respect to these borings or other soil data as such was portrayed in the plans or specifications, or in the invitation for bids.
On this initial visit, the Bolander representatives had arranged to meet with a local contractor, and they walked over the site with a guide from the Bureau of Public Roads and a representative of a local contractor, through heavy snows and subzero temperatures. Following this initial survey, the contractor’s representatives prepared a preliminary bid estimate and returned to the project site on February 25, 1958. On this second visit, they again conferred with the Bureau of Public Roads engineers and personnel attached to the Gatlinburg office. The Bolander representatives revisited the project site on February 25 and 27, 1958, and, although the snow cover remained, they walked along the center line of the project.
The contract required that the work be completed within 550 days after receipt of notice to proceed, and this established a completion date of October 2, 1959. The work was not in fact completed until 1,187 days after receipt of notice to proceed, that is, on June 30,1961. The contractor was given time extensions for this difference of 637 days and was not assigned responsibility for this delay. The record discloses a number of “directives” ordering the contractor to suspend performance of the work, presumably because of unsuitable working conditions. These directives were issued pursuant to Article 8.7 of Standard Specifications (FP-57), earlier mentioned. These specifications are not furnished with the board record. It is presumed that the cited article provided for additional time, but not additional compensation, since the directives were followed by adjustment of the completion schedule, but not of the contract price.
*408 On tlie conditions actually encountered by plaintiff, tbe following is directly quoted from tbe board’s decision denying plaintiff’s claim:
Tbe evidence proves conclusively that mucb of tbe soil on Project l-B-3 had a natural moisture content materially higher than tbe “optimum moisture content,” determined in accordance with a standard test — tbe Proctor test. There are two principal versions of tbe Proctor test. Tbe version applicable to tbe appellant’s contract, designated in tbe specifications as AASHO T 99, is tbe one that uses a lesser compactive effort and is usually termed tbe “standard” Proctor test.
The evidence also proves conclusively that the expense of grading major portions of Project l-B-3 was materially greater than would have been tbe case if tbe natural moisture content of all of tbe soils bad been at or about optimum as determined by the Proctor test. Tbe contract required tbe material excavated from tbe cuts to be used for building tbe fills. Tbe presence of soils with moisture contents materially greater than optimum affected tbe embankment costs as well as tbe excavation costs. Excavation of tbe soils from cuts, transportation, placement in fills, and compaction tended to turn them into mud and to cause them to lose strength. Since the soils frequently were too muddy for tbe successful operation of rubber-tired equipment, most of tbe work was performed with crawler equipment which, being slower, was less economical than rubber-tired equipment would have been, except on steep grades. Operations in mud also increased tbe wear and tear on tbe equipment, and thus led to higher costs. Outs had at times to be excavated piecemeal in shallow layers, so tbe freshly uncovered material would have an opportunity to dry before being removed. Material placed in fills often bad to be left undisturbed for days while it was undergoing further drying and was regaining tbe strength lost through handling. This necessitated moves of men and equipment from one cut or fill to another in order to keep tbe job going. Attempts to obtain tbe requisite degree of soil density by rolling each newly placed layer of embankment, without tilling or resting the material, were unsuccessful more often than not. While some of the expense occasioned by tbe wet soil could have been avoided through tbe use of better moisture control procedures by appellant, the remainder was unavoidable.
*409 Other facts, with respect to conditions encountered, are to be found elsewhere in the board’s decision interspersed with the conclusion that they did not constitute changed conditions. For example, the opinion states:
The soils that gave appellant difficulty on Project 1-B-3 were, in general, soils that contained a high proportion _ of fine particles — that is, particles capable of passing a No. 200 sieve — and that possessed almost no capacity for being moulded (plasticity). Soils with this combination of qualities are frequently characterized as silt. They are apt to have a high capacity to hold and retain water. In the instant case, abundant sources of ground water were afforded by the heavy rainfall common in the Great Smokies, and the capacity of the soil to hold 'and retain large quantities of water was confirmed by the high natural moisture readings obtained when Proctor tests were made.
As might be expected, since the foregoing is a description of the contractor’s difficulties in a decision which denies his appeal, it represents an understatement of those difficulties from the contractor’s point of view.
The board record supports the following additional findings.[11] A witness for appellant testified with respect to a conference on or 'about May 23, 1960, that the locally resident Assistant Division Engineer of the Bureau of Public Eoads had stated that he did not know what to do about the soil conditions at the job, and that he was going to seek expert advice from the Bureau in Washington, D.C. Another appellant’s witness testified that he had never seen anything like this before, and the contractor’s drainage foreman, locally resident and experienced in this type of construction, testified that the soil conditions were the worst he had ever encountered.
*410 Plaintiff’s original letter of April 27,1960, complained that from the inception of the contract, the excavated material had been unsuitable for the purpose intended; that it consisted of firm sedimentary deposits capable, because of their peculiar physical qualities, of retaining abnormal amounts of moisture; that the material was not considered desirable for permanent highway construction, and that it had greatly increased construction costs; that it was causing the Bureau of Public Roads great concern and anxiety; and that portions of the highway completed and opened to traffic had proved unsatisfactory because of the abnormal moisture-retaining qualities of the subgrade. Deficiencies in embankment material had occurred and been remedied by flattening previously graded and completed slopes, at additional cost.
The contractor’s formal letter of claim on November 18, 1960, incorporated an “Engineering Report on Soil Conditions” by a distinguished and highly qualified consulting engineer, Dr. John D. Watson of Greensboro, North Carolina. The record contains a resume of Dr. Watson’s outstanding qualifications in the specialty of soils mechanics. This engineering report followed a detailed physical inspection of the site by Dr. Watson in early June 1960, while the project was under construction. It is nine pages in length, supported by extensive appendices and data, and confirmed by 70 pages of direct and cross-examined testimony at the administrative hearing.
In brief summary, this expert concluded that three types of soil predominated along the highway site. One of these was “* * * a very weak shale that appeared to have some strength, or structure, in an undisturbed state. Plowever, on manipulation, its apparent strength disappeared completely and the soil developed a greasy feel, very wet and slippery though it did not, initially, appear to be so wet. A second prominent soil type was a very wet lean silty clay that had very low plasticity. And finally, the third prominent soil type was a silty rock flour, distinctly grainy, and in some spots it appeared to be a dirty sand. In all situations, it held a great deal of water, and on vibration it would become quaky and appear ‘livery’. Obviously, it 'had a low coefficient *411 of permeability and would be extremely slow to drain, even though, it would hold a very high percentage of moisture.”
Dr. Watson concluded that these soils, naturally low in strength, and weaker still after manipulation or remoulding, were largely unsuitable for successful use in constructing roadway embankments.
This report contains strong opinions supporting plaintiff’s entitlement to 'an equitable adjustment in contract price based on Dr. Watson’s interpretation of the contract documents and their application to the conditions observed. These are, of course, ultimate determinations as to the meaning of the contract, and peculiarly within the province of this court. Dr. Watson does state that the compaction requirements set forth in the contract 'are unusually stringent, and impossible of attainment with these soils and by use of normal construction equipment and methods.
A month prior to his field inspection, Dr. Watson engaged the Pittsburgh Testing Laboratory to sample and test these soils, and he concluded from the results of these tests that the natural moisture content was far in excess of optimum. This, coupled with their impermeability, made it absolutely impossible to fulfill the stringent compaction requirements of the specifications.
Article 106-3.5 of Standard Specifications (FP-57), entitled “Compaction,” is heavily relied upon by plaintiff and is therefore quoted from the board’s decision as follows:
Unless the special provisions state that watering and rolling are not required, all embankments shall be compacted in accordance with the following requirements.
Each layer of embankment material, except layers consisting of rock, shal] be moistened or dried to a uniform moisture content suitable for maximum compaction and then thoroughly compacted by rolling with tamping or pneumatic-tired rollers or 3-wheel power rollers conforming to the requirements of section 109. Subject to the modifications below, at least one roller shall be operated continuously for each 150 cubic yards, or fraction thereof, of material placed per hour. When several embankments, each of small area, are so isolated from each other that one roller cannot compact them satisfactorily, additional rollers shall be provided.
*412 The amount of rolling as required above is estimated as the minimum necessary for adequate compaction. Where the materials in the embankment permit practical density tests, the engineer may, during the progress of the work, make such tests, and if he finds the density, is less than 95 percent of the maximum density as determined by AASHO T 99, modified to include in the test sample all material passing a %-inch sieve, the contractor shall perform additional rolling as may be necessary to obtain that density.
The engineer may permit compaction with types of equipment other than those specified above provided he determines that use of the alternate equipment will consistently produce densities of not less than 95 percent determined as provided above. The engineer’s permission for use of alternate compaction equipment shall be given in writing and shall set forth the conditions under which the equipment is to be used.
Dr. Watson’s report outlines the contractor’s discovery that rubber-tired equipment was found to be useless and that much slower crawler-tractor equipment had to be substituted as the only feasible way to move the 'dirt. Moreover, compaction by use of equipment, as such, was never possible and was waived by the Government. Compaction, when it was achieved, was not accomplished as contemplated by Article 106-3.5 of the specifications above quoted. It was accomplished by permitting the material to dry into a state of compaction, in layers. This was very slow and also involved performing the work out of sequence, that is, scraping a layer of partially air-dried soil, and then moving to another area.
Dr. Watson enlisted the assistance of an engineer and soils mechanics specialist, Mr. C. Page Fisher of North Carolina State College. The latter also visited the site and tested soil samples in his laboratory. These confirmed Dr. Watson’s findings, and in addition, disclosed a property of these soils described as “thixotropic regain.” Mr. Fisher’s tests demonstrated that, although these soils lose more than half their original strength by remoulding, they fortuitously regain the greater part of this strength loss after a period of repose. This was what made it possible eventually to complete the project, albeit much later than originally contemplated by *413 both parties and by methods other than the use of conventional compaction equipment.
Mr. Fisher found that the natural moisture content equalled or exceeded the liquid limit for these soils. When they occur naturally in a saturated condition, they cannot readily be dried out. Hence, highway engineers generally regard them as unsuitable for embankment construction.
In addition to the foregoing, the contractor’s formal claims letter of November 18, 1960, observes that this contract was to be performed on the side of a mountain and at an elevation where good drainage could normally have been anticipated.
Plaintiff supplemented the foregoing with a letter of December 18,1961. It encloses an affidavit[12] of one Clarence M. Branam, of Gatlinburg, who also testified at the hearing. This affiant and witness, a former employee, was not, however, employed by Bolander at the time his affidavit was subscribed and sworn nor at the time of his testimony. He states that he was on the project daily, and although employed on many construction jobs in this area, had never seen such muddy conditions. “* * * [M]y personal observation indicated that the moisture in this subsoil was present when it was excavated and certainly was not the result of rain or surface water * * *. I, have never in my experience in this field, which covers a period of thirty years and with several road building contractors * * * seen similar conditions such as existed with respect to this subsoil.”
There is also enclosed a letter from the vice president of a machinery equipment supplies firm stating:
$ ‡ *
Having specialized in compaction equipment of every kind, I have never seen materials used in roadway construction of this poor quality nor do I know of any compaction equipment that would give satisfactory compaction. The inherent moisture content was so high and the absorption factor of the materials so great mat no method I know of could economically reduce this moisture content to a workable level. I know this material by *414 the definition of “dead soil” and is normally waste material.
* H: * * *
Finally, plaintiff submitted an affidavit of one Hallum K. Cook, an employee of the Atlas Powder Company, who had frequent occasion to visit the site. He stated:
:ji # :’s # #
During the period from 1957 to 19601 visited practically every road construction project in East Tennessee and Western North Carolina, and to my knowledge I have never seen on any job the type of material encountered or the extreme wet subsoil conditions which prevailed on Project 1B3. It seemed evident to me that the material was not wet as a result of recent rains or surface water, but was saturated with moisture as it was uncovered and removed from the excavation.
* * * * =i=
In his notice of appeal dated July 2,1962, plaintiff recites an additional fact of some relevance. It is that there was a “* * * rapid break up of the surface treatment type of pavement applied by the Contractor in accordance with the specifications * * *. It was necessary for the government to repave all of the pavement placed by the Contractor and this involved a new contract and new contractor coming on to the job site prior to the finishing of the job by this Contractor. The reason why this Contractor’s surface treatment failed is peculiarly within the knowledge of the Bureau, but it is suspected that the high moisture content of the fill on the embankments came to the surface under the vibration of traffic and ruined the pavement and caused its disintegration. After the initial pavement placed by the Contractor failed, the Bureau deleted such items from the contract. Additional evidence of the unsuitability of the material is the need for additional under drains that were placed by another contractor to drain water out of the roadway.”
There is no indication in the record that fault for any of these difficulties with the pavement was attributed to the plaintiff.
A brief furnished in support of the foregoing notice of appeal further describes the unusually difficult conditions *415 encountered and details their impact on the contractor’s equipment and costs.
In summary then, the foregoing constitute the narrative, subsidiary facts gathered from the Interior Board’s decision, and elsewhere from the record underlying that decision. As previously indicated, these are facts as to which there is essentially no dispute, or which are overwhelmingly supported by the record in any event. On the basis of those facts, the board has decided that plaintiff has not established a first category changed condition; nor a second category changed condition; nor a breach of contract based on misrepresentation by nondisclosure.
Is this a “decision * * * concerning a question of fact” as to which the court’s power to review would be limited by the Wunderlich Act tests; or is it a “decision * * * on a question of law” as to which the court’s power to review would not be so limited ? It is concluded that, at least as to the first question, the board’s decision is on a question of law, or at the very least, on a mixed question of law and fact in which the law ingredient is predominant, essential, and in all respects crucial. Moreover, it is concluded that the decision as to the first issue is in error as a matter of law for the reasons following.
With respect to first category changed conditions, the decision, after setting forth the facts above quoted concerning the contractor’s difficulties, concludes that these “'proved facts, however, do not establish that a changed condition was encountered. It must also be shown by a preponderance of the evidence that the presence of soils with natural moisture contents greater than optimum * * * was contrary to what the contract indicated * * [Emphasis added.]
Alluding to the text of Article 106-3.5 “Compaction” of FP-57, above quoted, the Interior Board concluded that this article, properly construed, did not constitute an “indication” of “subsurface or latent physical conditions 'at the site” within the meaning of the “Changed Conditions” article.[13]
*416 This is fundamentally a decision interpreting the contract, and therefore a decision on a question of law.[14] It involves the meaning of Article 106-3.5 “Compaction,” its relationship to Article 4 “Changed Conditions,” and the relationship of both of them to the agreed facts. This court is not, therefore, bound by that decision, nor by its rationale.[15]
The board’s analysis of these two contract provisions, with which the court does not agree, proceeds as follows: Article 106-3.5, “Compaction,” “like the other provisions of FP-57, forms part of a set of standard specifications that are designed to be ‘generally applicable to direct Federal highway projects.’ It was not written specifically for this contract. It not only permits the contractor to use rollers of any one of the three maj or types, but also permits the Government engineer to authorize the use of other types of equipment for compaction purposes. It specifies a minimum amount of rolling, but describes that amount as the ‘estimated’ minimum necessary for ‘adequate compaction,’ and provides that the contractor shall perform additional rolling if necessary to obtain the required density. Even the quantitative designation of the degree of density required is not absolute, but is to be applied where the embankment materials ‘permit practical density tests.’ The very generalized nature of the article affords little opportunity for the drawing of inferences concerning the natural moisture content or other properties of the soils on a particular highway project.”
It is difficult to understand why the article on compaction and the specifications within which it is contained are disparaged because they are “standard specifications.” They are, in fact, the only specifications relating to this contract. It was on the authority of these specifications, for example, that the contractor’s work was frequently suspended by directive, when working conditions were not suitable for reasons not chargeable to the plaintiff.
*417 In a similar case in which the defendant sought to downgrade the role of a resident engineer on a construction project[16] the opinion dryly suggested that “It would be inane indeed to suppose that the resident engineer was at the site for no purpose. * * *” It would be equally inane to suppose that this article on compaction and all the specifications were in this contract for no purpose.
They set forth mandatory requirements for compaction “by rolling with tamping or pneumatic-tired rollers or 3-wheel power rollers * * The terms “rollers” or “rolling” are frequently mentioned. There was a clear implication (or “indication,” using the word in the “Changed Conditions” article) that these were soils capable of compaction to 95 percent of the maximum density as determined by AASHO T 99. And it is equally clear on the agreed facts that this was not the method by which these soils could be, nor were, eventually compacted.
As required by the contract, and prior to commencement of the work, plaintiff submitted a list of the conventional earth-moving and compaction equipment he intended to utilize. The administrative decision argues that because the Government did not approve or disapprove this list, no inference can be drawn therefrom. This ignores the implications and indications inherent in the compaction provisions.
In the Kaiser case (note 14 supra, 169 Ct. Cl. at 321, 340 F. 2d at 328), the court stated: “* * * This drawing cannot be dismissed with the statement that it gave, as set forth in the above-quoted note, only ‘general’ information, with the contractor being obliged to assume complete responsibility based upon its own examination of the core borings and the site. In the language of Article 4 [Changed Conditions], it ‘indicated’ more than that. * * *”
Even assuming, arguendo, that the provision on compaction was not a representation, it was at the very least misleading and ambiguous, and the consequences of that ambiguity are chargeable to the author.[17]
*418 Because this is a review of an agency’s administrative decision, and because similar cases are frequently the subject of agency board decisions, it is noteworthy that many of these have afforded relief under the “Changed Conditions” article in similar factual circumstances.[18]
The Interior Board’s decision in this case asserts that a “lack of realization of the importance of tilling or otherwise drying the soil before attempts were made to roll or otherwise compact it contributed to the failures of appellant’s work to pass the density tests. * * * Positive measures for aeration of the soil frequently were not attempted until the natural strength of the material had been weakened by untimely efforts to compact it before it had had an opportunity to dry. * * * The failures on test were also due in substantial part to a lack of realization of the importance of adequately resting the soil after each manipulation. * * * Notwithstanding the test failures, the weight of the evidence is that a degree of density at least equal to 95 percent of maximum density was actually obtained at all locations where the achievement of such a degres of density was really important. Almost one-third of the tests were recorded as satisfactory. * * *”
These arguments beg the question. Of course, plaintiff met with partial success and eventually completed the project, by the unconventional, time-consuming, and costly methods above described and acknowledged in the board’s opinion. These are the very circumstances attributed to changed conditions and offered as the basis of this claim by the plaintiff. A job scheduled to be completed in 550 days actually consumed 3 years and 3 months, and the contractor was not charged with this delay nor assessed liquidated damages, in recognition of the fact that the circumstances encountered were beyond his control and without his fault or negligence.[19]
*419 When the board concludes in this portion of its opinion that the project was “* * * capable of being completed to the standards required by the Government through the use of construction practices and equipment that were not so unreasonable or so uncommon for road-building purposes as to be unforeseeable by appellant. * * *” [emphasis added], it is applying tests which are not to be found in the “Changed Conditions” article. Measured by the test set forth in that article, plaintiff did encounter “subsurface or latent physical conditions at the site differing materially from those indicated in this contract.”[20]
Because the plaintiff is entitled to recover on the foregoing ground, it is unnecessary for the court to reach or consider the other two issues in the case presenting alternative (but not cumulative) theories of recovery, i.e. whether the claim is also covered by the “second category” of the “Changed Conditions” article, and whether the defendant made 'actionable misrepresentations amounting to a breach of contract redressable in this court. The existence of the latter “breach claim” (Count 2 of the petition) presents no difficulty in this case as to the method of calculating recovery. With respect to that cause of action, the plaintiff has waived any right to a court trial of damages and has specifically agreed that, even if that count were sustained as a separate claim, the matter of the amount of recovery should be remitted to the Interior Department Board of Contract Appeals for determination of an equitable adjustment under the “Changed Conditions” clause.
Accordingly, it is ordered that the present proceedings be stayed for a period of 90 days under Eule 100 to permit further administrative proceedings in the Interior Department, leading to a determination of the amount by which the contract price should be equitably adjusted. Further action by *420 the court will be deferred pending the outcome of these administrative proceedings.
CONCLUSION OF LAW
Plaintiff is entitled to recover under Count One of its petition. It is ordered that the present proceedings be stayed for a period of 90 days under Rule 100 to permit further administrative proceedings in the Interior Department, leading to a determination of the amount by which the contract price should be equitably 'adjusted. Further action by the court will be deferred pending the outcome of these administrative proceedings. Plaintiff shall comply with Rule 100 and the General Order of April 1,1968.

 United States v. Utah Constr. & Mining Co., 384 U.S. 394 (1966) ; United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 (1966).

 68 Stat. 81, 41 U.S.C. §§ 321-22 (1964 etf.).

 This procedure was followed prior to the adoption by the court of Rules 94 through 100, “Wunderlich Act Reviews,” effective June 1, 1967. The assignment of errors procedure accomplished essentially the same purpose as do the current Rules.

 “CHANGED CONDITIONS — The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.”

 “DISPuTES — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall furnish to the Contractor a written copy of his decision. Such decision shall be final and conclusive unless within 30 days from the date of receipt thereof, the Contractor appeals therefrom by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representatives upon such appeal shall be final and conclusive unless the decision is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. In connection with any appeal proceeding under the “Disputes” clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.”

 Note 2 supra.

 “Eact is fact and law is law, and never the twain shall meet; Yet which is which and what is what, escapes e’en law’s elite.” [Attributed to Arvin upton, Esq., Washington, D.C.]

 River Constr. Corp. v. United States, 159 Ct. Cl. 254 (1962).

 Morris, Law and Fact, 55 Harv. L. Rev. 1303 (1942). See also Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Colum. L. Rev. 1259 (1947) and Say It With Music, 61 Harv. L. Rev. 921 (1948) ; Paul, Dobson v. Commissioner: The Strange Ways of Law and Fact, 57 Harv. L. Rev. 753, 803, 810 (1944) ; Isaacs, The Law and the Facts, 22 Colum. L. Rev. 1 (1922) ; and Brown, Fact and Law in Judicial Review, 56 Harv. L. Rev. 899, 904 (1943).

 Note 1, supra. See also Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 757, 345 F. 2d 833 (1965).

 Additional findings relevant to the decision, and required by the record, are warranted. The board’s analysis may include narrative or intermediate findings not relevant to the ultimate finding or decision. Contrariwise, it may fail to articulate intermediate or subsidiary findings, fully supported by the board record, and essential to the board’s ultimate finding or decision. See Report of Proceedings of Judicial Conference, Court of Claims, Sept. 26, 1966. See also, Loral Electronics Corp. v. United States, 181 Ct. Cl. 822, 387 F. 2d 975 (1967) ; and Utah, note 1 supra, 384 U.S. at 419 n. 15.

 The infirmities inherent in affidavits are obvious. They are sworn, but not cross-examined,. Paradoxically, the transcript of the board’s hearing indicates that the witnesses were cross-examined, but not sworn.

 Note 4 supra.

 United Contractors v. United States, 177 Ct. Cl. 151, 162, 174, 368 F. 2d 585, 595-96, 603 (1966) ; Kaiser Indus. Corp. v. United States, 169 Ct. Cl. 310, 330, 340 F. 2d 322, 333- 34 (1965) ; John A. Johnson Contracting Corp. v. United States, 132 Ct. Cl. 645, 656, 132 F. Supp. 698, 708, (1955).

Wunderlich Act, note 2 supra.

 General Cas. Co. v. United States, 130 Ct. Cl. 520, 533, 127 F. Supp. 805, 812-13, cert. denied, 349 U.S. 938 (1955).

 See Kaiser, note 14 supra, 169 Ct. Cl. at 332, 340 F. 2d at 334-35.

 D. H. Dave & Gerben Contracting Co., 1962 B.C.A. ¶ 3493, ASBCA No. 6257; Paccon, Inc., 1962, B.C.A. ¶ 3546, ASBCA No. 7648 ; Jefferson Constr. Co., Eng. B.C.A. No. 1866; Terry & Wright, Inc., Eng. B.C.A. No. 1783; Al Johnson Constr. Co. & Peter Kiewit Sons’ Co., Eng. C. & A. No. 950.

 Cf. Loftis v. Unted States, 110 Ct. Cl. 551, 622, 76 F. Supp. 816, 822-23 (1948).

 Cf. Shepherd v. United States, 125 Ct. Cl. 724, 113 F. Supp. 648 (1953) ; Bregman Constr. Corp., 1964 B.C.A. ¶ 4426, ASBCA No. 9000; D. H. Dave & Gerben Contracting Co., note 18 supra; Blount Bros., 59—2 B.C.A. ¶ 2316, ASBCA No. 4780 ; Hewitt Contracting Co., Eng. B.C.A. No. 1445 ; Lipsett, Inc., Eng. B.C.A. No. 1327; Giordano Constr. Co., Eng. B.C.A. No. 1186; C. T. Wilson Contracting Co., Eng. C. & A. No. 966; Piombo Constr. Co., Eng. C. & A. No. 461.