**FAIRFIELD SCIENTIFIC CORPORATION**

v.

**The UNITED STATES.**

No. 145–78.

United States Court of Claims.

Dec. 12, 1979.

James V. Joy, Jr., New York City, attorney of record, for plaintiff.

Robert E. Richardson, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's request pursuant to Rule 54(b) for review of the recommended decision of Trial Judge Philip R. Miller, filed January 29, 1979. The case has been submitted to the court on the briefs and oral argument of counsel. Since the court agrees with the trial judge's recommended decision and conclusion of law, as modified by the court, it hereby affirms and adopts the same, as modified, as the basis for its action in the case. In remanding the claim to the Armed Services Board of Contract Appeals for consideration on the narrow issue of possible bad faith in the exercise of discretion by the contracting officer, the court emphasizes that the board is not authorized or directed to reopen the issues concerning the contract reprocurement.

## OPINION OF TRIAL JUDGE

### MILLER, Trial Judge:

This suit seeks to set aside a decision of the Armed Services Board of Contract Appeals (ASBCA). Such decision upholds a contracting officer's order terminating by reason of default plaintiff's supply contract with the Navy Department; and it also affirms to the extent of $46,946.60 the contracting officer's assessment against plaintiff for excess costs of reprocurement of the supplies. Defendant has counterclaimed for the same amount, and plaintiff has not denied the allegation that it remains unpaid. In its briefs plaintiff no longer dis-

putes the finding that there was a default[1] but does challenge the finding that the default was not excusable. It also claims that the board erred (1) in limiting plaintiff's cross-examination of the contracting officer and (2) in finding that the supplies were in fact reprocured.

I

On October 27, 1972, the Navy awarded to plaintiff a contract for the manufacture and delivery of 500,000 impulse cartridges at $0.57 per unit, and subsequently exercised an option to increase the number to 580,000.[2] The contract required delivery of the first 100,000 units within 90 days after approval of first article test samples. The first articles were approved on June 13, 1973, and initial deliveries were due by September 13, 1973.

Plaintiff was unable to meet its commitment, and sought extensions of time to make delivery. By letter to the procuring officer (PCO) dated August 27, 1973, plaintiff explained that a subcontractor which was to have supplied extruded aluminum cases for the cartridges "had been unable to deliver as promised due to breakdown of equipment and a delay in receiving their raw material." After a September 28, 1973 meeting between plaintiff's president, Mr. Oscar Lew Cohen, and the PCO, in which Cohen represented that the company was negotiating to subcontract a part of the quantity ordered to Space Ordnance Systems, Inc. (S.O.S.) of Saugus, California, which was already producing the impulse cartridges for the Navy, the parties modified the contract to require delivery of the first production quantity of 50,000 units by October 31, 1973, with 100,000 additional units by the end of each succeeding month until completed, in consideration for a reduction of $100 in the total contract amount.

On October 29, 1973, plaintiff's president Cohen again met with the PCO and disclosed that S.O.S. had rejected plaintiff's order for the manufacture of the impulse cartridges for plaintiff. Plaintiff then proposed a revised delivery schedule to begin in December 1973, contingent on plaintiff's ability to obtain the cartridge cases, with a $500 additional reduction in the contract price as consideration for the extension. Mr. Cohen was expected to send a letter immediately after the conclusion of the meeting confirming the proposed revised delivery date and terms. However, plaintiff was unable to obtain the cartridge cases from the manufacturer and Cohen never did send the confirming letter. Also, on October 30, 1973, the PCI telephoned the manufacturer of the cartridge cases, and the latter informed him that it had canceled its contract with the plaintiff and would not furnish any cases to plaintiff because of plaintiff's failure to pick up the initial shipment which had been sent C.O.D. Whereupon, on November 5, 1973, the contracting officer terminated the contract with plaintiff.

The notice stated that plaintiff's right to proceed further had been terminated because after investigation it had been determined that plaintiff would be unable to obtain the cartridge cases from its vendor in order to meet either the delivery schedule agreed to on September 28 or the further modified schedule plaintiff had proposed at the October 29 meeting, and that plaintiff was in default for having failed to make progress on the contract.

Plaintiff claims that the contracting officer and the board should have found that plaintiff's default was excusable because it was caused by the wrongful refusal of plaintiff's sole source cartridge case supplier to make delivery. The board ruled that it was unnecessary to find whether or not the supplier was actually a sole source, be-

---

1. Before the board plaintiff claimed there was no default because its time for delivery had been further extended beyond the October 31, 1973 due date. The board found to the contrary, and plaintiff's brief contains no similar contention now.

2. Such cartridges are used primarily for release and ejection of bombs and other stores from aircraft in flight and to actuate refueling hose guillotines in emergencies.

cause of its findings that in any event plaintiff's failure to perform was within plaintiff's own control and was caused by its own fault and negligence. The circumstances follow.

Prior to the award plaintiff had solicited and received quotations for the manufacture of the cartridge case from one domestic and two Canadian vendors. The quotation by the domestic company, U. S. Extrusion Impact, Inc., of New Albany, Mississippi, a division of Piper Industries (Piper), had been lowest $0.11 each for 500,000 units.

Piper had doubts as to plaintiff's credit worthiness and initially insisted upon "cash in advance" of shipment terms. After plaintiff accepted such terms, Piper wrote that when the first shipment was ready it would call or wire advising plaintiff of the quantity and the amount due and upon receipt of plaintiff's check it would make shipment. As a result, on May 21, 1973, plaintiff issued its firm purchase order to Piper for 520,000 cartridge cases with delivery of 50,000 units every 2 weeks commencing July 20. The board found that at the time this purchase order was placed both Fairfield and Piper understood the terms of payment to be cash in advance; and plaintiff has not excepted to this finding.

Piper thereafter relented slightly from its insistence upon cash in advance of shipment and substituted cash on delivery. The board found that by letter dated July 27, 1973, Piper advised plaintiff that "shipments will begin on a C.O.D. basis rather than cash in advance and shipments will proceed in this manner until such time as we have established an open line of credit." On August 1, 1973, Piper shipped via Roadway Express Company, a common carrier, 75 cartons containing 50,700 aluminum cartridge cases from New Albany, Mississippi, to plaintiff's plant in Andover, New Jersey, with an accompanying bill of lading stating "This Shipment Is C.O.D. Amount $5,830.50", and "To Be Prepaid." On the following day, August 2, Piper mailed to plaintiff an invoice in the same amount and plaintiff received it on August 6, 1973.

Thus plaintiff had reason to expect that it would receive the 50,700 cartridge cases shortly thereafter. The invoice contained the printed notice "Terms Net 30 Days" applicable to Piper's sales generally; but in view of the prior explicit cash terms insisted upon by Piper and agreed to by plaintiff, and the absence of any intervening change in circumstances, plaintiff could not have been misled and there is no claim that it was.

Nevertheless, when on August 15, 1973, the carrier attempted to deliver the shipment to plaintiff, plaintiff failed to tender the C.O.D. payment, and the carrier had to return the goods to its own warehouse to await instructions from the shipper.

From approximately the beginning of August through August 20, 1973, the plaintiff's president, Mr. Cohen, was on vacation. However, he testified, he had left instructions with a Mrs. Jefferson to call Mr. Flanagan, the comptroller, to arrange for payment if word was received of the shipment. Flanagan was in turn to prepare a check for the signature of Michael J. Gasparik, treasurer and director of plaintiff and also president of plaintiff's parent corporation. But there is no explanation in the record as to why this arrangement was not carried out. Mr. Gasparik was notified on or about August 15 that the C.O.D. shipment of extruded cartridge cases had arrived and was being held by the carrier, but Mr. Gasparik did nothing to arrange for acceptance of the shipment because (in his words)—

It was Mr. Cohen's responsibility * * I didn't want to be involved in the problem. It is a line problem and for Mr. Cohen to take care of * * * In other words, the "monkey was not on my back" to worry about how the problem was going to be resolved. I didn't want to concern myself with it.

Gasparik further testified that on or about August 15 the carrier informed him that it would retain the shipment in its warehouse for a period of about 2 weeks, long enough for Cohen to return.

Cohen claimed that plaintiff did not pick up the C.O.D. shipment because he was not

given enough time and was misled by Roadway Express. He testified that when he returned from his vacation on Monday, August 20, and learned of the shipment, he called the carrier and its representative assured him it would be held until Thursday, August 23, but that when he called the carrier again on August 21 someone informed him that the shipment was already gone.

The board did not attach any credence to that explanation—and with good reason:

First, it was inconsistent with the unquestioned documentary evidence. An airmail letter from Piper to Cohen dated August 23 stated that Piper had instructed Roadway Express to return the shipment if not accepted by August 24. A telegram from Piper to Cohen dated August 27 stated that plaintiff should contact Roadway immediately and make arrangements for delivery or else the shipment would be returned to Piper. A telegram from Roadway Express to Piper dated August 28 stated that the carrier was still holding the C.O.D. shipment in New Jersey waiting for the consignee to set up a delivery date and asked Piper for instructions. A handwritten notation on this second telegram by Piper's sales manager stated that in response to it he had called Roadway the same day and had advised it to return the parts unless Fairfield had accepted them or would cover storage charges.

Second, Cohen's conduct was not consistent with the alleged receipt of information from Roadway Express on August 21 that the vital components had already been returned to the shipper. The record contains no explanation as to why he did not telephone Piper at once (or at least after receipt of Piper's August 23 letter or August 27 telegram), explain how he had been misled, offer to send a check immediately and ask for reshipment. Instead, the record reflects that he waited 2 months, until October 25, 1973, 6 days before delivery of the first installment of the finished product was due, before he got in touch with Piper again and sought to place a new order for the components.

Third, the board had specific occasion to comment adversely on Cohen's credibility in a related context. Plaintiff's letter of August 27 to the Government (written by Cohen), stated in support of plaintiff's first requested extension of its delivery schedule that its sole source supplier of the cases "has been unable to deliver as promised due to breakdown of equipment and a delay in receiving their raw material." The board found, however, that "at the time appellant wrote this letter, it knew that a shipment of approximately 50,000 cartridge cases had arrived in Andover, New Jersey, but had not been paid for or claimed by Fairfield."

Under the governing Wunderlich Act, 41 U.S.C. § 321, the evaluation of the credibility of witnesses and the choice of documentary evidence over doubtful oral testimony is properly a function of the fact finder rather than of the reviewing court.

Plaintiff objects to the finding that at the time of shipment of the cartridge cases to it in August 1973, it was aware that it had to pay cash on delivery, on the ground that the finding is based on inadmissible hearsay evidence, namely Piper's letter of July 27, 1973, to it, which stated that Piper would make its first shipment on August 1 and that it would accept a C.O.D. payment in lieu of cash in advance after notice of intended shipment. Plaintiff complains that no witness testified to the letter's authenticity.

The ASBCA rules, which are a part of the procurement regulations, permit the admission of such documentary evidence under the following circumstances (32 CFR § 30.1, Part II (1973)): [3]

20. *Nature of hearings.* Hearings shall be as informal as may be reasonable and appropriate under the circumstances. * * * Letters or copies thereof, affidavits, or other evidence not ordinarily admissible under the generally accepted rules of evidence, may be admitted in the discretion of the presiding member or

3. And *see also* 32 CFR § 1.314(d) (1973).

examiner. The weight to be attached to evidence presented in any particular form will be within the discretion of the Board, taking into consideration all the circumstances of the particular case. * * *

■■ The procurement regulations are implied terms of the contract, to which plaintiff must be deemed to have acquiesced in entering into it. *Dravo Corp. v. United States*, 480 F.2d 1331, 1333, 202 Ct.Cl. 500, 504 (1973); *General Builders Supply Co. v. United States*, 409 F.2d 246, 250–51, 187 Ct.Cl. 477, 484 (1969). Furthermore, it is settled generally that an administrative tribunal is not required to exclude hearsay evidence in the form of a document if its authenticity is sufficiently convincing to a reasonable mind and if it carries sufficient assurance as to its truthfulness. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Pascal v. United States*, 543 F.2d 1284, 1289, 211 Ct.Cl. 183, 191 (1976); *Reil v. United States*, 456 F.2d 777, 780, 197 Ct.Cl. 542, 548 (1972); *N. Fiorito Co. v. United States*, 416 F.2d 1284, 1295, 189 Ct.Cl. 215, 234–35 (1969); *J. D. Hedin Construction Co. v. United States*, 408 F.2d 424, 427–28, 187 Ct.Cl. 45, 50–52 (1969).

Navy trial counsel obtained the document from Piper about 10 days before trial, in response to his telegram to Piper requesting generally copies of the documents involved in its dealings with plaintiff. The substance of the letter (*i. e.*, that Piper would shortly thereafter send the cartridge cases to plaintiff C.O.D.) is corroborated by the very action which followed, and by the fact that no motive is suggested as to why Piper would falsify such a document. Therefore, there was a reasonable basis for the board to be assured of its genuineness so as to warrant its admission in evidence.

Beyond admissibility plaintiff also raises the question as to the sufficiency of such hearsay as substantial evidence upon which to base the finding that Piper sent the July 27, 1973 letter to plaintiff, so as to warrant

the board's inference that upon its receipt plaintiff was on notice that it had to have available within a short time thereafter the funds with which to pay for the shipment.

The leading case on the sufficiency of hearsay as substantial evidence to support a finding is *Richardson v. Perales, supra.* There the Supreme Court held that written reports by physicians who had examined a claimant for disability insurance benefits could constitute substantial evidence to support a nondisability finding by the Secretary of Health, Education and Welfare and satisfy procedural due process, notwithstanding the hearsay character of the reports, the absence of cross-examination, and the directly opposing testimony by the claimant and his medical witness, as long as the claimant was given the opportunity in advance to know the contents of the reports, to subpoena the reporting physicians and to provide himself with cross-examination, even if the claimant did not in fact take advantage of that opportunity. The Court said that the matter comes down to a question of "fundamental fairness."

Piper sent Navy counsel the copy of its July 27, 1973 letter to plaintiff on March 2, 1977. The pretrial order required counsel to exchange supplemental evidentiary exhibits by March 4. On March 9, defendant reported to the board that it had furnished such documents to plaintiff. Plaintiff's counsel could not have received the documents prior to March 4. On the first day of trial, March 15, the presiding board member received the July 27, 1973 letter in evidence over plaintiff's objection that its source was "[h]earsay and third hand." On the same day, Cohen testified he had never seen the letter before his counsel showed it to him. On the following day plaintiff moved that it be permitted to take in Mississippi and file with the board within 30 days after trial "a deposition of Marshall Robbins of Piper Industries to address itself to the question of whether or not documents [including the July 27, 1973 letter] * * * are authentic and were dispatched to appellant."[4]

---

4. Plaintiff states that authority for the subpoena and deposition may be found in 5 U.S.C. § 304.

The presiding board member denied the motion on the ground that such deposition was unnecessary to enable the board to exercise its discretion as to the weight to be given to the documents under the board rules.

In view of the obviously inadequate time available to plaintiff prior to trial in which to subpoena and depose a Piper official in Mississippi and the board's refusal to allow it thereafter, under *Richardson v. Perales, supra,* there is indeed a question as to whether the unauthenticated July 27, 1973 letter may constitute substantial evidence for the finding that plaintiff knew that it had to have the money available within a short time thereafter to pay for the vital cartridge case components C.O.D.[5]

However, there is no need to resolve the question, since even without regard to the July 27 letter, there is substantial evidence to support the board's determinative finding that plaintiff's failure to perform the contract was within its own control because its failure to obtain the components was caused by its own fault or negligence. As already indicated, plaintiff knew when it placed its order for the cartridge cases that it would have to pay for them in advance. There was no basis for plaintiff to believe that without any reason Piper had changed its mind and was extending credit to plaintiff. On August 6 it received an invoice indicating shipment of the parts on August 2, and on August 15 the bill of lading for the C.O.D. shipment was presented to it. Thereafter plaintiff was allowed a minimum of 14 days (August 15–28) to make payment and accept the shipment. It failed to do so and it has furnished no credible justification for such failure. This was a breach of its agreement with its supplier. Under these circumstances Piper was clearly entitled to withhold delivery of the goods, to have them returned to it, and to dispose of them elsewhere in mitigation of

its damages (Uniform Commercial Code § 2–703), as in fact it did.

It is of no importance whether the responsibility for accepting the C.O.D. shipment was delegated by plaintiff to Mr. Cohen, Mr. Gasparik, Mrs. Kennedy, Mr. Flanagan, or any other person employed by plaintiff. If plaintiff's failure to make a scheduled delivery of the final product was due to the failure to obtain necessary components, plaintiff cannot fairly claim that the failure was excusable because it was not at fault. Plaintiff knew that it had to pay for the components on or before delivery. It had ample notice of the shipment (whether August 6 or 15), and its failure to receive the merchandise was either negligent or otherwise within its own control.

Plaintiff claims that the default was excusable because it could not reasonably anticipate Piper's behavior in canceling its order on October 26, 1973. The evidentiary basis for this argument is solely Cohen's testimony. He stated that at a conference with Piper's sales manager, Marshall Robbins, on October 25, 1973, the latter told him that he had just accepted an order to manufacture 400,000 cartridge cases for S.O.S. using the then hard-to-obtain aluminum acquired previously for plaintiff's canceled order and with the aid of plaintiff's materials priority rating. According to Cohen, Robbins then told him that Piper would still have enough aluminum to manufacture and deliver to plaintiff 10,000 cases immediately and from 20,000 to 40,000 per month in the succeeding months, and orally agreed to do so. The board declined to make any such finding, possibly again because of its view of Cohen's credibility or possibly because under the rationale of its decision it deemed such a finding irrelevant, or both. However, it did find that on the following day, October 26, 1973, Piper formally advised plaintiff that it considered

---

5. There was no question of disproportional expense to defendant in subpoenaing the author or custodian of the letter. Since plaintiff wanted to take the deposition, it would have had to bear its cost. Furthermore, since Title 5 U.S.C. § 304 does not restrict the manner of taking the deposition, the board could have prescribed

that it be taken by written interrogatories, or even on the telephone. Nor would the delay have been of consequence, because the board allowed the record to remain open after trial for about 45 days for defendant to submit additional documents.

plaintiff's purchase order canceled because of the default in payment on the first C.O.D. shipment of cases and was declining to participate further with Fairfield "under any circumstances."

Plaintiff asserts that Piper's change of heart on October 26 was induced by S.O.S., which must have offered Piper higher prices than did plaintiff for the cases, and that the conduct of both companies was unforeseeable and beyond plaintiff's control; and hence plaintiff's failure to deliver was excusable. The board concluded, however, that there is no evidence in the record upon which it could base any finding whatsoever that S.O.S. induced Piper to cancel its contractual arrangement with plaintiff for Piper's greater profit and that the argument was supported only by speculation and innuendo. The board's conclusion is clearly supported by the record. In any event, plaintiff's scenario does not help it, since nothing that Piper did or did not do on October 26 could have mitigated plaintiff's failure to deliver the finished products on the then extended due date for the first installment, October 31. Furthermore, the standard default clause itself (32 CFR § 7.103–11, incorporating § 8.707 (1973)) to which plaintiff agreed in its contract with the Government defeats plaintiff's argument. That clause provides in part as follows:

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

* * * * * *

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule. [Underscoring supplied.]

Under this clause whether or not the failure to perform is caused by the default of a subcontractor, it is not excusable unless it arises out of causes beyond the control of and without the fault or negligence of the contractor (plaintiff). Here, there is substantial evidence to support the board's finding that plaintiff itself was at fault or negligent in not accepting shipment of and paying for an essential component of the supplies it had contracted to deliver to defendant.

Plaintiff also argues that its nonperformance should be excused because of alleged interference by plaintiff's competitor, S.O.S., which induced defendant to terminate its contract with plaintiff. The board also found that there is no evidence in the record upon which it could base any finding whatsoever that S.O.S. induced defendant to cancel defendant's contractual arrangement with plaintiff, and that such argument, too, was supported only by speculation and innuendo. Such finding likewise is supported by the record.

However, plaintiff raises a more substantial question of law with respect to the reason why it was unable to establish improper interference or influence by S.O.S. in

the contracting officer's decision to terminate plaintiff's contract. Plaintiff's attorney sought to interrogate Mr. Warner, the contracting officer, on this subject as a part of his cross-examination and was barred from doing so. The transcript of the testimony records the following:

> JUDGE GROSSBAUM: You can make an offer of proof or an offer of the question you would have asked.
>
> MR. JOY: * * * The question I would have asked of Mr. Warner would have been * * * from September 7, 1973 through November 5, 1973 * * * whether anyone from Space Ordnance discussed any delinquency on the part of Fairfield Scientific in the performance of the B250 contract and asked that the contract be terminated for default.
>
> * * * * * *
>
> MR. GEFFEN: Your Honor, the Government would represent [resent] that. It is completely irrelevant to the questions being considered at this hearing.
>
> JUDGE GROSSBAUM: * * * That question is improper because no foundation has been laid for it.

Contrary to the defendant's objection the question was relevant. The default clause does not say that the Government "shall" or "must" terminate the contract in the event of default, only that the Government "may" terminate it. Not only is the contracting officer to consider whether or not the default is excusable, but the regulations require him to consider at least seven factors in addition to the default in deciding whether or not to terminate the contract.[6] "The existence of discretion is undeniable." *Schlesinger v. United States,* 390 F.2d 702, 707, 182 Ct.Cl. 571, 581 (1968). If the contracting officer was improperly influenced by plaintiff's competitor or by anyone else to terminate the contract for default rather than to exercise his own independent judgment in the light of the factors set out in the regulations, it would represent an abdication rather than an exercise of his discretion. *See Schlesinger v. United States, supra; John A. Johnson Contracting Corp. v. United States,* 132 F.Supp. 698, 704–05, 132 Ct.Cl. 645, 658–60 (1955). And *see also Pacific Architects & Engineers, Inc. v. United States,* 203 Ct.Cl. 499, 516–17, 491 F.2d 734, 744–45 (1974).

■ Nor is there merit to the presiding board member's ruling that the question put to the contracting officer should be excluded because no foundation was laid for it. Even if counsel had no proper factual basis for the belief that the contracting officer's decision was arrived at improperly, he still had the right to ask. It is fundamental to a fair trial that on cross-examination counsel may not be required to lay a foundation, to make an offer of proof, or to establish that a question would necessarily or probably bring forth favorable testimony. Almost 40 years ago, in *Alford v. United States,* 282 U.S. 687, 691–92, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931), the Court stated:

> Cross-examination of a witness is a matter of right.
>
> * * * * * *

**6.** ASPR § 8.602–3 (32 CFR § 8.602–3 (1973)) states in part:

"(a) * * * The PCO shall consider the following factors in determining whether to terminate a contract for default:

"(1) The provisions of the contract, and applicable laws and regulations;

"(2) The specific failure of the contractor and, unless time does not permit, the excuses, if any, for such failure;

"(3) The availability of the supplies or services from other sources;

"(4) The urgency of the need for the supplies or services and the period of time which would be required to obtain the supplies or services from other sources as compared with the time in which delivery could be obtained from the delinquent contractor;

"(5) The degree of essentiality of the contractor in the Government procurement program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts;

"(6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments; and

"(7) Any other pertinent facts and circumstances."

Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. [Citations omitted.] It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop.

A more recent decision discussing *Alford* states (*United States v. Alston*, 460 F.2d 48, 51 (5th Cir.), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972)):

Although in * * * *Alford* the defense erected on appeal a substantial likelihood that significant evidence might be gleaned from a knowledge of a witness's home address, the opinion * * * make[s] clear that a defendant need not establish that an undeveloped line of questions foreclosed by a Government objection would necessarily lead to a disclosure of contradictory or impeaching material against the witness.

And *see also United States v. Fife*, 573 F.2d 369, 376 (6th Cir. 1976) and *note, Appeal and Error—Excluding Evidence on Cross Examination—Preservation for Appeal*, 33 N.Car.L.Rev. 476 (1955).

 Defendant now concedes that the question "might, conceivably, relate to whether the contracting officer's decision to terminate for default was rendered in bad faith" but argues that "plaintiff neither properly raised, pleaded, nor currently argues that issue." But the grounds for a motion for summary judgment need not have been included in the prior pleadings. It is enough that notice of the moving party's position is given in the motion papers, so that the opposing party has an adequate

opportunity to respond. The pleadings may be amended to conform to the evidence even after judgment. *Comprehensive Designers, Inc. v. United States*, 545 F.2d 1283, 210 Ct.Cl. 719, 722 (1976); *Roloff v. Arabian American Oil Co.*, 421 F.2d 240, 242 (2d Cir. 1970); and *see* Court of Claims Rules 39(b) and 101(d).

Plaintiff does argue in its brief that the purpose of the question was to allow plaintiff to follow up with the question, "Did you terminate the contract because S.O.S. asked that it be terminated?" While this does not expressly use the term "bad faith", the implication is clear.[7] Plaintiff also raised the issue of bad faith before the board. By letter dated March 4, 1977, plaintiff asserted that the pretrial order did not fully reflect its contentions because—

whether Space Ordnance's actions prevented appellant's performance is also contended by appellant to be a legitimate issue *to the extent that government personnel collaborated with Space Ordnance*. [Emphasis supplied.]

 Nothing herein is intended to imply that the contracting officer was in fact improperly influenced by plaintiff's competitor in arriving at his decision to terminate plaintiff's contract. However, basic fairness requires that at the least plaintiff not be precluded from asking about it where there is nothing to indicate that the question is designed merely for personal abuse or harassment of the witness and does not serve a legitimate purpose.

## II

Despite the necessity for remand because of a procedural defect, in view of the fact that the issue has been fully briefed by both sides it seems appropriate to consider plaintiff's claim that the evidence does not es-

7. Defendant also argues in a footnote—

"Even assuming plaintiff had properly raised the good faith of the contracting officer as an issue, the Board's evidentiary ruling does not constitute prejudicial error because the contracting officer's response, even if affirmative, would not have constituted the 'well-nigh irrefragable proof' of bad faith needed 'to induce

the court to abandon the presumption of good faith dealing.' "

But such argument is appropriate for the board to consider after the plaintiff has made its full record, and cannot support defendant's motion for summary judgment before plaintiff has been allowed to complete its cross-examination.

tablish that the Government incurred $46,-946.60 in excess costs for procurement of the impulse cartridges.

By September 7, 1973, the Navy Ship Parts Control Center (SPCC), Mechanicsburg, Pennsylvania, to which had been delegated procurement of the impulse cartridges, determined that its stock of cartridges was becoming depleted. At the same time, officials of that agency expressed apprehension that procurement through Fairfield Scientific Corporation was in jeopardy and its delivery unpredictable. On that date, SPCC initiated a procurement request for an additional quantity of 800,000 units of the impulse cartridges. Pursuant to such request, on October 15, 1973, SPCC issued invitations for bids (IFB) on alternative quantities of 400,000 and 800,000 of such units for the Navy, with SPCC having the option of ordering either quantity. SPCC contemplated that if S.O.S. was the low bidder the entire quantity of 800,000 units would be awarded to it. However, if another company was the low bidder, SPCC contemplated the possibility of awarding the low quantity range of 400,-000 units under the IFB and still negotiating the remaining quantity of 400,000 units with S.O.S., which had already established its ability to produce the items without further delay. Accordingly, the board found that as of October 15, 1973, the date the IFB was issued, SPCC had an existing requirement to procure a total quantity of 1,380,000 impulse cartridges for the Navy—580,000 under Fairfield's existing contract, and 800,000 additional units as set forth above. Thus, when on November 5, 1973, prior to the date set for bid opening, plaintiff's contract was terminated for default, this left SPCC with a shortfall of 580,000 units.

On November 14, 1973, the bid opening date, six bids were received, including bids from S.O.S. and plaintiff. SPCC determined that Technical Ordnance, Inc., of Minneapolis, Minnesota, was the low bidder, at 71.8 cents each for the 400,000 quantity and 65.7 cents each for the 800,000 quantity. Although SPCC's original intent was to award 400,000 to the low bidder and 400,000

to S.O.S. on a negotiated basis, because of plaintiff's default and termination SPCC decided to award a total of 1,200,000 impulse cartridges. On January 24, 1974, SPCC awarded contract B434 to S.O.S. for 400,000 units at 79.6 cents each. On January 25, 1974, it awarded contract B435 to Technical Ordnance, Inc., for 800,000 units at 65.7 cents each, together with an option in favor of the Government to increase the quantity by 100 percent at the same price. The board found that 400,000 units of the total under (lower-priced) contract B435 represented a repurchase of the quantity of supplies ordered under Fairfield's terminated contract, while the remaining 800,000 units satisfied the Navy's previously existing requirements established by the September 7, 1973 procurement request.

On December 3, 1973, a further procurement request was prepared and approved for the acquisition of 300,000 additional impulse cartridges. To satisfy this need and also the 180,000 deficiency still remaining from plaintiff's default, SPCC exercised its option under contract B435 to enlarge the quantity by 480,000 units, increasing the total under that contract from 800,000 to 1,280,000 impulse cartridges. The board found that 180,000 units out of the increased option quantity of 480,000 represented the repurchase of a like quantity of the supplies previously ordered under plaintiff's terminated contract.

The Government accepted final shipment of impulse cartridges under contract B435 on March 4, 1976, and paid therefor on March 19, 1976. The board found that pertinent documents submitted by defendant established delivery and acceptance of 1,273,480 impulse cartridges under contract B435 and further established payments by the defendant therefor amounting to more than $828,600.

The contracting officer computed the excess procurement costs to be $50,460. However, the board determined that he had failed to consider certain discounts and it recomputed the excess costs as follows:

Repurchase Contract B435

| | | |
|---|---|---|
| 580,000 units at $0.6502[8] | | $377,116.00 |

Defaulted Contract B250

| | | |
|---|---|---|
| 580,000 units at $0.57 | $330,600.00 | |
| Less discount at 0.10% | (330.60) | |
| Sub-Total | 330,269.40 | |
| Less reduction in price per Mod P00004 | (100.00)[9] | 330,169.40 |
| Excess Costs | | $ 46,946.60 |

Plaintiff contends first that the computation of the excess repurchase cost is improper because the Government did not intend the subsequent purchases as reprocurements of the items which plaintiff was to have delivered under the defaulted contract. Plaintiff argues that had they been so intended the purchases could have been traced by following the same appropriation numbers. The board found first, based on the parties' own stipulation, that the items procured under contract B435 were technically similar to the supplies ordered under Fairfield's terminated contract B250. This finding was not excepted to. The board also found that before contract B435 was issued SPCC had determined to treat 580,000 of the units to be delivered under that contract as a repurchase of the items covered under plaintiff's contract terminated for default. This is adequately documented by a contemporaneous memorandum dated January 21, 1974, from the contracting officer to the contract review board. It is immaterial whether the 580,000 came out of the fist 800,000 units delivered by Technical Ordnance or whether 400,000 came out of the first 800,000 and 180,000 came out of the subsequent exercise of the Government's option under contract B435 to add another 480,000 units, since both were at the same price. Plaintiff also argued to the board that it was necessary to "trace" the applicable appropriations in order to con-

8. The 65.7 cents per cartridge in contract B435 was reduced to 0.6502 cents by an equitable adjustment to the contract price resulting from a value engineering change proposal by the contractor increasing the number of cartridges per container. This re-resulted in a discount of $3,944.

9. The $100 reduction in plaintiff's contract price has been agreed to by plaintiff in consideration for the extension of time to make its initial delivery to October 31, 1973.

nect the repurchases to the defaulted contract. To this the board replied:

> In view of our finding that the requirement for the supplies ordered under contract B250 persisted after the default termination * * *, we consider the tracing of specific appropriations immaterial to the disposition of this appeal.

Plaintiff cites no authority for imposing a requirement that the same appropriation number be used in the repurchase.

Next, plaintiff argues, defendant was obligated to produce material inspection and receiving reports, DD Forms 250, for all of the 580,000 units reprocured. Absent these DD 250 reports, plaintiff urges, there is no proof that the substituted items were accepted as satisfactory equivalents of those specified in the defaulted contract. Again plaintiff cites no authority in support of its contention that acceptance and payment for the reprocured items must be manifested by particular forms.

Plaintiff's reliance on *Whitlock Corp. v. United States*, 159 F.Supp. 602, 141 Ct.Cl. 758, *cert. denied*, 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958), to support this argument is misplaced. In *Whitlock*, the Government had chosen to stand merely on the proof that it had awarded a repurchase contract, plus a certified copy of a certificate of indebtedness from the General Accounting Office stating, *inter alia*, that the total cost to the Government of the repurchase contract was in the stated amount. The court held that proof to be insufficient because "the Certificate of Indebtedness did not constitute proof that the repurchase contract had either been performed or paid for." (159 F.Supp. at 607, 141 Ct.Cl. at 765.) The court did not define the proof required; it granted the Government's motion to reopen proof in order to submit certified copies of the vouchers and canceled checks covering payment under the repurchase contract and then found that such evidence did establish the amount of the excess costs actually paid.

■ In this case, the board's finding 47 states that "pertinent documents submitted by respondent * * * establish delivery

and acceptance of a quantity of 1,273,480 impulse cartridges under Item 0001 of contract B435 and further establish payments by respondent therefor amounting to more than $828,600." The opinion further states that although the Government did not submit all of the material inspection and receiving reports (DD Form 250)—

respondent's acceptance of the supplies may reasonably be inferred from other pertinent documents (such as: invoices, bills of lading, material acceptance and accounts payable reports and advices of payment) which furnish evidence of shipment, delivery and payment. The supplemental documents submitted by respondent establish shipment and delivery by the repurchase contractor of a quantity of more than 1.2 million impulse cartridges under schedule Item 0001 of contract B435 and payment therefor, amounting to more than $800,000, by respondent.

Plaintiff does not except to finding 47 nor to the statements of fact contained in the opinion which explain its underlying basis for that finding. In any event, there is substantial evidence to support that finding.

## CONCLUSION OF LAW

This case is remanded to the ASBCA to reopen the record to permit plaintiff to cross-examine the contracting officer on the subject matter set forth in part I of this opinion which the board erroneously failed to allow, and to permit the board to amend its findings if as a result of such cross-examination the evidence so warrants. Plaintiff is designated to advise the court of the status of the proceedings on remand pursuant to Rule 149(f).