Yang KUE, Administrator of the Estate
of Khoua Kue, Deceased, Petitioner,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 88–5–V.

United States Claims Court.

Nov. 2, 1989.

Milton I. Isserlis, Providence, Rhode Island, atty. of record for petitioner.

Charles R. Gross, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for respondent.

## OPINION [1]

REGINALD W. GIBSON, Judge:

This vaccine injury case has been filed under the authority of the National Child-

---

[1] This decision may contain information that should not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12 (Supp. V 1987). Accordingly, within 14 days of the date of this decision, *i.e.*, on or before November 16, 1989, the parties shall file a memorandum designating any material subject to § 300aa–12 and such material will be deleted for public access. If on review of this decision, there are no objections filed by

hood Vaccine Compensation Program, 42 U.S.C. § 300aa–10, *et seq.* (West Supp.1989) (the Act). The matter is presently before the court pursuant to the Report of Special Master Bryan J. Bernstein, filed on June 20, 1989, by authority of 42 U.S.C. § 300aa–12(c)(2).

■■■ Said Report was filed following a hearing on the merits held on May 3, 1989. At that hearing the petitioner called three witnesses—Yang and Zer Kue, the parents of Khoua Kue, the deceased infant; and a medical expert, Dr. Louis I. Hochheiser. The petitioner also introduced documentary evidence to support his claim. The respondent, on the other hand, introduced *no* testimonial witness, offering instead some documentary evidence.[2]

In his Report, the Special Master concluded that:

"1. The petitioner properly filed a petition under 42 U.S.C.A. § 300aa–11.

2. The petitioner's son, Khoua Kue died as a result of a hypotonic-hyporesponsive collapse characterized under 42 U.S.C.A. § 300aa–14(b)(1).

3. The death of the petitioner's son, occurring one day after administration of the DPT vaccine, fits within the covered inju-

ries set forth in the Vaccine Injury Table at 42 U.S.C.A. [§] 300aa–14(a).

4. The petitioner demonstrated his case by a preponderance of the evidence required by 42 U.S.C.A. [§] 300aa–13(a)(1)(A).

5. The respondent did not demonstrate by a preponderance of the evidence that the death was due to factors other than the vaccine as required under 42 U.S.C.A. § 300aa–13(a)(1).

6. The petitioner should be awarded compensation for a vaccine-related death under 42 U.S.C.A. [§] 300aa–15(a)(2), (b), and (e)."

■■■ The respondent objected to these conclusions on July 10, 1989, after which the petitioner filed his Memorandum In Opposition to Objection to Proposed Findings of Fact and Conclusions of Law on October 25, 1989. On the basis of the Report of the Special Master, and after a thorough review of the evidence and the total record, we find that the matters required to be shown under the Act by the petitioner have been proven by a preponderance of the evidence and support the recommendations of the Special Master. Moreover, creditable proof is wanting that death was due to factors unrelated to the administration of the vaccine described in the petition.

---

November 16, 1989, then it shall be deemed that there is no material subject to § 300aa–12.

**2.** At the hearing, the respondent sought to rely upon a previously prepared statement of one Dr. Cynthia G. McCormick, introduced as Defendant's Exhibit 5. The Special Master, over the petitioner's objection, received the document into evidence, but did not consider it during subsequent deliberations. We observe first that the April 2, 1989 statement of Dr. McCormick, introduced as Defendant's Exhibit 5, is not, as purported by the respondent, an affidavit. It was neither sworn to under oath nor was the signature authenticated. Further, the respondent made no showing of unavailability with respect to Dr. McCormick's ability to testify. The failure to produce Dr. McCormick, who was under the respondent's control and whose statements in Defendant's Exhibit 5 purport to be in the interest of the respondent, warrants an adverse inference. *Morowitz v. United States,* 15 Cl.Ct. 621, 631 (1988).

Secondly, Defendant's Exhibit 5 is clearly *unadulterated* hearsay. The purported testimony of the respondent's putative expert seeks to neutralize the petitioner's expert opinion testimony and to corroborate the conclusions

reached in the autopsy report. However, the petitioner did not have the opportunity to previously depose Dr. McCormick, and, moreover, was denied the right to cross-examine her. Consideration of Dr. McCormick's statement would, therefore, be a denial of procedural due process without allowance for cross-examination. Thus, Defendant's Exhibit 5 must be viewed as inadmissible hearsay. *Cf. Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Fairfield Scientific Corp. v. United States,* 222 Ct.Cl. 167, 611 F.2d 854 (1979).

Finally, even assuming, *arguendo,* that Defendant's Exhibit 5 was admissible, the following facts are relevant: (1) Dr. McCormick never examined the deceased and (2) Dr. McCormick's statement is based solely and exclusively on the autopsy report. Since the autopsy report is in evidence and was considered by the Special Master, the conclusions of Dr. McCormick are merely cumulative vis-a-vis the autopsy report. Thus, even if Defendant's Exhibit 5 were admissible, which we expressly find it was not, the Special Master's failure to consider it was no more than harmless error.

Therefore, we adopt, and incorporate herein by reference, the attached Report of the Special Master regarding the factual findings and conclusions of law on the merits. Additionally, and consistent with the foregoing, we find that the petitioner is entitled to an award of $250,000 in statutory compensation pursuant to 42 U.S.C. § 300aa–15(a)(2) (West Supp.1989).

## Attorney's Fees and Other Costs

■ On May 15, 1989, petitioner filed his claim for attorney's fees in the amount of $14,135.00. Attached to said claim was an affidavit of an attorney practicing in the same locale as petitioner's attorney who averred his knowledge of the latter's record and that "an hourly rate of $100 is a fair and reasonable attorney's fee for an attorney with the experience and expertise of Mr. Isserlis." Also, there was attached a Time Sheet, consisting of seven (7) pages, detailing, by date, the time applied to subject case, and the precise activity. The petitioner claimed 141.35 hours at $100.00 per hour for a total of $14,135.00 in attorney's fees.

Petitioner, by three (3) separate submissions, asserted the following claims for costs:

| Date | Costs |
|---|---|
| (i) June 2, 1989 | $6,702.60 |
| (ii) June 7, 1989 | $ 151.51 |
| (iii) October 26, 1989 | $1,020.00. |

The detailed cost schedule identifying expenditures by date, consisting of three (3) pages, was attached in support of the $6,702.60 claim. The $151.51 claim was identified as "expense made for a transcript," and the $1,020.00 claim was for additional attorney's fees of 10.2 hours at $100.00 per hour.

Title 42 U.S.C. § 300aa–15(e)(1) (West Supp.1989) provides only that the "judgment of the ... Court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover—(A) reasonable attorneys' fees, and (B) other costs...." Thus, it is incumbent on petitioner's counsel to establish that said fees claimed, *i.e.*, the $100.00 hourly rate, is reasonable within the contemplation of the statute.

In support of this burden, all that was proffered was an affidavit by a fellow attorney of petitioner's counsel to the effect that—(i) he has practiced law in the State of Rhode Island for 25 years; (ii) he has experience and knowledge and is familiar with fees usually charged by attorneys therein; (iii) he has known petitioner's counsel, Mr. Milton I. Isserlis, for a period of 20 years; (iv) he is familiar with Mr. Isserlis's experience as a trial lawyer; and (v) in his opinion, in an action such as the one at bar "an attorney's fee based on an hourly rate of $100 is a fair and reasonable attorney's fee for an attorney with the experience and expertise of Mr. Isserlis."

The court does not view the bland conclusory assertions in said affidavit of Mr. Irving J. Waldman to constitute prima facie evidence of reasonableness. Said affidavit is totally void of any demonstrative showing insofar as how and why $100.00 per hour *is a reasonable fee* for an attorney of Mr. Isserlis's experience and competence to charge in such a case as exists at bar. In the absence of such proof, and specific guidance in the statute, we embrace the pronouncement of the United States Supreme Court as persuasive in *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 2553–54, 101 L.Ed.2d 490 (1988), where it held in an Equal Access to Justice Act (EAJA) case that "Congress thought that $75 an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." Consequently, because of the failure of definitive proof of reasonableness, attorney's fees shall be limited to $75.00 per hour. Thus, the total attorney's fees and other costs allowed shall be as follows:

| | | |
|---|---|---|
| (i) | Attorney's fees (141.35 hours at $75.00) | $10,601.25 |
| | (10.2 hours at $75.00) | 765.00 |
| (ii) | Other costs ($6,702.60 + $151.51) | 6,854.11 |
| Total | | $18,220.36. |

Given the foregoing, we also award to petitioner $18,220.36 in attorney's fees and

other costs pursuant to 42 U.S.C. § 300aa–15(e) (West Supp.1989).

*Conclusion*

In total, the Clerk is hereby directed to enter judgment for the petitioner in the amount of $268,220.36. As petitioner's son received the DPT vaccine on April 24, 1986, which was before the effective date of the Act (October 1, 1988), payment of said compensation shall be made in four equal annual installments, commencing upon entry of judgment. 42 U.S.C. § 300aa–15(f)(4)(B) (West Supp.1989). No additional costs.

IT IS SO ORDERED.

### REPORT OF THE SPECIAL MASTER TO THE COURT *

June 20, 1989

BRYAN J. BERNSTEIN, Special Master.

The petitioner filed for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C.A. § 300aa–1 et seq. (1988) [hereinafter the Vaccine Act]. The petition sets forth a claim under the Vaccine Act for the death of petitioner's infant son, Khoua Kue. The infant died on April 25, 1986, one day after administration of the diphtheria, pertussis and tetanus (DPT) immunization. The respondent answered denying many elements of the petition. The court held a series of conferences, proposed an alternative method of dispute resolution, and finally conducted a hearing. The record is now complete. This report follows from the Special Master's review.

The Special Master recommends that the court award the petitioner $250,000 for the estate of the deceased[1] and $20,989.11 in attorneys' fees and other costs.[2] As explained below, the petitioner has demonstrated his entitlement to this award by a preponderance of the evidence. He has proved the allegations necessary in his petition under § 300aa–11(c)(1). Further, the respondent did not prove that the death of the infant was due to factors unrelated to the administration of the DPT vaccine. The petitioner has filed claims and supporting documentation to establish the reasonableness of attorneys' fees and other costs.

*Facts in Evidence*

Khoua Kue was born February 1, 1986 (Transcript (Tr.) p. 16). The petitioner's expert reviewed the infant's birth history and presented the following account (Respondent's Exhibit No. 2, a letter from petitioner's expert witness):

> The infant's birth history revealed a normal pregnancy to a mother who had five previous pregnancies and living children. Khoua was 5 lbs. 14 oz. at delivery and had no recorded problems from birth to the time of visit of 4/24/86 to the Allen Berry Health Center. Weight at that time was 11 lbs. 1 oz. with normal height and head circumference. Physical examination was normal other than the finding of a monilia skin rash. Development and nutrition were noted as adequate on a scale of adequate or inadequate. The first DPT and oral polio vaccines were given. The parents signed the usual form acknowledging the complications to the vaccine.

A report by the respondent's expert witness (Respondent's Exhibit No. 4) confirmed these observations.

Testimony by the infant's mother produced one notable element of evidence that was not considered in this account (Tr. 45–47). The petitioner neglected to include in the petition, evidence of an appointment for a blood test at the Allen Berry Health Center on April 7, 1986.[3] The petitioner's counsel promptly obtained and furnished a

---

* The report recommended findings of fact and conclusions of law, are submitted pursuant to 42 U.S.C. § 300aa–12(c)(2)(E) and Vaccine Rule 18 of General Order 23. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of the report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

1. 42 U.S.C.A. § 300aa–15(a)(2).

2. 42 U.S.C.A. § 300aa–15(e).

3. *See* the letter to Milton Isserlis from M. Madeline Place dated May 8, 1989.

report of this visit from the hospital which had tested the collected blood. The results of this blood test appear to have been normal. The respondent expressed its interest in this evidence (Tr. 49) and it was admitted into the record by order subsequent to the hearing.

The record contains substantial documentation surrounding the administration of the DPT vaccine. In preparation for the DPT shot a licensed, pediatric physician examined the infant and found him to be healthy and happy (Petitioner's Exhibit No. 4). The mother stated that she visited the physician with her child at 7:00 p.m., April 24, 1986. She stated the baby smiled, kicked, and laughed. She testified that it was healthy and without fever (Tr. 23). The mother explained that a nurse administered the shot in the upper left leg. The baby then began to cry. After five minutes the baby fell asleep feeding from a bottle of milk (Tr. 29). The baby continued to sleep throughout the ride home and until about 11:00 p.m. when his mother awakened him to change his diaper (Tr. 34).

The petitioner could not clarify whether this pattern of sleep was especially unusual. The parents did not speak English and there was difficulty in translating testimony on this issue. The mother, however, did testify that the baby usually awakened to feed around 9:00 or 10:00 p.m. (Tr. 33). This night, when awakened by his mother for changing, the baby cried very briefly with his eyes shut, drank a small amount of milk, and fell back to sleep (Tr. 34). The baby had no fever (Tr. 35). In the morning at 5:00 a.m. (April 25, 1986) the mother discovered Khoua Kue dead, lying exactly as he had been placed after his diaper was changed the night before.

Medical examiners conducted an autopsy (Petitioner's Exhibit No. 5) apparently without communication from the parents (Tr. 36–37). Expert review of the eight page autopsy report presented this account (Respondent's Exhibit No. 4):

Postmortem examination was obtained and revealed evidence for multifocal and chronic bronchopneumonia of the lungs with perivascular subpleural and midpar-

enchymal locations. The inflammation was thought to suggest a viral etiology, however no inclusions were seen. There were also small abscesses in the tonsils and inflammation of the epiglottis and to a lesser extent in the kidneys, liver and salivary glands. The brain, although it was normal grossly, showed evidence also of microabscesses. Special stains for bacteria, fungi, and AFB were negative. Cultures of the blood and lungs postmortem grew bacteria not thought to be of clinical significance.

*Discussion*

Although this child had normal a course to age three months, the pathologic findings revealed evidence for subacute and chronic infection involving primarily the lungs but other organ systems as well. Although the causative organism was not isolated, nor histologic markers found, the findings at post mortem are suggesting an infectious etiology which are not dated but are at least indicative of a subacute if not a chronic process, not one of less than 24 hour's duration.

The petitioner's expert presented this conclusion in a letter to the petitioner's counsel (Respondent's Exhibit No. 2):

There are several concerns related to the outcome of this case. An infant developing normally who is seen by a pediatrician less than twelve hours before without illness having a sudden death from bronchopneumonia. One can not deny the pathological findings consistent with bronchopneumonia but the death occurring this way is highly unusual. Although extremely rare there is a complication of Pertussis vaccine which includes "collapse with shock-like (hypotonic-hyporesponsive) state". Had this occurred during the night it is quite possible that this contributed significantly to Khoua's death. The minimal bronchopneumonia should not have caused this dramatic demise in this infant.

The expert witness, Louis I. Hochheiser, M.D., is Professor and Chairman of the Department of Family Practice at the University of Vermont College of Medicine in

Burlington, Vermont.[4] In live testimony the physician acknowledged his familiarity with sudden infant death in children, particularly deaths associated with vaccines and other causes. He stated that studies show that sudden infant death is seven times more likely within 3 days of DPT shot. (Tr. 65).

Dr. Hochheiser explained his analysis of the infant's death in the present case. He noted that he based his opinion on the entire record, including the medical records, birth history, well visit exam and affidavit, the autopsy, the respondent's expert report, and the parents' account. He concluded that the vaccine "most probably caused the death." (Tr. 67).

The respondent's expert's contrary recommendation had been introduced into the record (Respondent's Exhibit No. 4):

*Recommendation*

It is not recommended that compensation be awarded under the Vaccine Injury Compensation Program since the medical evidence indicates that the injury does not fulfil the criteria of the injury table in the statute, and the preponderance of medical evidence indicates that the injury identified in the petition is due to factors unrelated to the administration of the vaccine.

The petitioner's expert testified that this opinion "left out" that the child, well and active at 7:00, suddenly had a change in behavior (Tr. 68). The respondent's report did not consider the parents' experience and the affidavit of Ellen Gurney, M.D., the physician who examined the baby before the shot. The respondent's expert, therefore, did not base her opinion upon the complete history. (Tr. 72).

The expert physician who testified criticized the autopsy finding of bronchopneumonia. He noted that the bronchi, the tubes of the lung, were not filled with fluid as they would normally be were a child to die from such a condition. There was no inflammation that usually occurs with the virus that most commonly causes bronchopneumonia (Tr. 74). A child that dies of

pneumonia is under intense respiratory distress, cannot sleep, is fussy, and feverish for several days. Such babies have difficulty breathing, nasal flaring and retraction into the chest. This child exhibited none of these symptoms (Tr. 68).

Dr. Hochheiser challenged the autopsy's conclusion that subacute or chronic bronchopneumonia caused this baby's death. The only time children die from this condition is in a very acute situation, usually involving bacterial infection. The other circumstance of such rapid death is bacterial meningitis and there is no evidence of that in this case (Tr. 69). In this case the illness had to be very mild not to have been noticed (Tr. 135). Without the DPT shot, the child would have recovered without incident from a subacute viral pneumonia. Without the DPT shot, a bacterial bronchopneumonia would have presented bronchitis with symptoms of severe respiratory distress which would have required an antibiotic (Tr. 140). The histological evidence in the autopsy report did not confirm the presence of bacteria that would cause pneumonia (Respondent's Exhibit No. 4).

The petitioner's expert concluded that the DPT vaccination affected the infant by causing the hypotonic hyporesponsive state. (Tr. 69). This experience occurs once in 1750 cases of the immunization of infants. Usually this response to the vaccine leads to no more than a period when the child is hypotonic and unresponsive without prolonged neurological problems. On rare occasions children suffer cardiac respiratory arrest. In the present case, Dr. Hochheiser noted that after the vaccination the baby was unresponsive to environmental stimuli, showed depression, showed loss of consciousness and prolonged sleeping which then resulted in cardiovascular or respiratory arrest. There is no knowledge of decreased muscle tone, paralysis or hemiplegia, also components of the hypotonic hyporesponsive state. However, the child showed three of six or seven symptoms (Tr. 69–70).

The respondent did not present evidence to rebut the testimony of petitioner's wit-

4. See, curriculum vitae at Petitioner's Exhibit No. 9.

nesses—the parents and Dr. Hochheiser. Other than the report by Cynthia McCormick, M.D., *supra,* the respondent presented no original evidence.

## The Respondent's Case

The respondent's counsel elected not to present witnesses. In lieu of a hearing, the respondent proposed to exchange affidavits and written submissions. Counsel explained in a prehearing conference that the United States government, the departments of Justice and of Health and Human Services, could not assign additional medical expert support to this proceeding.[5] Further, the respondent urged the shortage of staff and the priority on reviewing petitions prevented staff experts from appearing as witnesses in vaccine cases.

In support of its motion to suspend proceedings the respondent's counsel offered several proposals and objections. To accommodate the respondent, the Special Master suggested an alternative method of dispute resolution. In the spirit of the respondent's proposal the parties agreed that before the hearing the parties' experts would discuss this case. Another special master was selected to serve as moderator only for potential settlement. The presence of counsel and the settlement master was to be optional. However, respondent's counsel conferred with Department of Health and Human Services personnel and then declined to participate in these novel proceedings.

In its Answer[6] the respondent raised the following affirmative defenses:

1. That the petitioner lacks capacity to seek compensation under the Vaccine Act;

2. That the United States Claims Court lacks jurisdiction over the subject matter of the petition;

3. That the petitioner has not supported his claim with a preponderance of the evidence;

4. That the preponderance of the evidence demonstrates that Khoua Kue died due to factors unrelated to the administration of the DPT vaccine.

The respondent's Consolidated Pretrial Filings[7] essentially restated these defenses. However, the respondent raised many contextual attacks on the petitioner's evidence during the hearing. None of these attacks elicited any testimony or valid inferences from testimony to support the respondent's defense.

## Discussion

The eligibility of the petitioner to recover in these proceedings is governed by the terms of the Vaccine Act. The petitioner's case fulfills the requirements set forth there.

The testimony of the mother, the father and their expert considered with the exhibits and other documents in the record persuasively establish the petitioner's case under § 300aa–11(c)(1).[8] That section refers to the Vaccine Injury Table at § 300aa–14 which identifies death as a sequela to hypotonic-hyporesponsive collapse. In a related passage the statute describes this response in vaccination victims. The petitioner's expert's testimony convincingly overcame the contrary conclusion of the autopsy report and excluded bronchopneumonia as the primary cause of the infant's death.

The Vaccine Act at § 2113(b)(1)(A) states that an autopsy warrants consideration in the deliberations over the evidence. In the present case both the petitioner's expert and counsel held the medical examiners who wrote the autopsy report in high esteem. They praised their diligence and the extent of the report. Thus, the autopsy in this case was strong evidence for the respondent whose case was otherwise virtually unsupported by affirmative evidence and testimony.

An autopsy is the post mortem examination of a body, including the internal organs and structures after dissection, so as

---

**5.** See also Respondent's Motion to Suspend Proceedings, filed April 27, 1989, and attached letter.

**6.** Filed December 30, 1988.

**7.** Filed April 27, 1989.

**8.** Especially 42 U.S.C.A. 300aa–11(c)(1)(C)(i).

to determine the cause of death or the nature of pathological changes.[9] The findings and the determination of medical examiners must be objectively based upon the evidence before them. In this case there are no lingering signs of neurological reaction or any other reaction to the vaccine. What the examiner's found, they reported. Mild as the infection was, the expert's were left with little evidence of any other cause of death.

However, the autopsy is not enough to show a preponderance of evidence for an alternative cause of death. While the autopsy found death due to sub-acute and chronic bronchopneumonia, it did not consider significant evidence. The conclusion notes that the parents described the child as "quiet" after the vaccination. During the hearing careful examination of the parents revealed that the baby slept deeply soon after the vaccine and was barely aroused for a diaper change. After four hours of sleep without feeding, the baby managed to drink only two or three times before becoming unconscious again. The baby did not awaken for his normal feeding at 9:00 p.m., nor during the night.

In light of the additional information, a different conclusion is necessary. Subacute and chronic pneumonia did not present noticeable symptoms at 7:00 p.m. to a pediatric physician, nor to the experienced mother at any time. It is not a creditable cause of death here. In view of the child's behavior after the DPT inoculation, the preponderance of the evidence supports a different finding. The child died from respiratory or cardiac arrest resulting from a hypotonic-hyporesponsive collapse.

The petitioner, having properly filed under the Vaccine Act, should be awarded compensation. The record as a whole supports a finding that he has demonstrated by a preponderance of the evidence all of the elements required of his petition under the Vaccine Act. Further, the respondent failed to establish by a preponderance of the evidence that death was due to factors unrelated to the administration of the vaccine described in the petition.

9. Dorland's Illustrated Medical Dictionary 73

The United States Claims Court has jurisdiction over this petition under 42 U.S. C.A. 300aa–12(a).

*Recommended Findings of Fact*

1. The infant, Khoua Kue, was born on February 1, 1986.

2. The infant, Khoua Kue, was healthy at birth.

3. The infant, Khoua Kue, died on April 25, 1986.

4. On April 24, 1986, at about 7 p.m., a DPT Vaccine was administered to the infant, Khoua Kue, at the Allen Berry Division of the Providence Ambulatory Health Care Foundation, Inc. in Providence, Rhode Island.

5. Immediately preceding the administration of the DPT shot the infant, Khoua Kue, was examined and found to be healthy and happy and otherwise well by Ellen Gurney, M.D., a physician specializing in pediatrics and licensed to practice medicine in the State of Rhode Island.

6. Immediately before the administration of the DPT vaccine, the examination of the infant, Khoua Kue, showed that his temperature was normal.

7. An agent of the Allen Berry Division of the Providence Ambulatory Health Care Foundation, Inc. administered the DPT vaccination to the infant, Khoua Kue.

8. Immediately after the inoculation, the infant, Khoua Kue, cried for a few minutes.

9. The infant, Khoua Kue, then closed his eyes and drank a small amount from a bottle.

10. The infant, Khoua Kue, then became quiet, and never opened his eyes again.

11. The infant, Khoua Kue, was then brought home and placed in his crib asleep.

12. The infant, Khoua Kue, did not have his usual bottle at 9 p.m.

13. The mother of the infant, Khoua Kue, changed his diaper at about 11 p.m., at which time the infant cried a little.

(1988).

14. The infant, Khoua Kue, was then given a bottle and drank a small amount, but made no further sound or movement before losing consciousness.

15. The infant, Khoua Kue, was found dead at 5 a.m. in the same position in which he was placed the night before.

16. The infant, Khoua Kue was taken to the St. Joseph Hospital by the rescue squad and was pronounced dead at 6:06 a.m. on April 25, 1986.

17. The report of the St. Joseph Hospital on April 25, 1986, indicated that the death of the child occurred several hours before 6:06 a.m.

18. No one from the rescue squad that came to the home and picked up the child to take him to the St. Joseph Hospital on April 25, 1986, obtained any post inoculation history from the parents.

19. No one from the Medical Examiner's office of the State of Rhode Island who performed an autopsy on the infant, Khoua Kue, obtained a post inoculation history form the parents.

20. After the administration of the DPT vaccine the infant, Khoua Kue, was unresponsive to environmental stimuli.

21. After the administration of the DPT vaccine, the infant, Khoua Kue, suffered depression of consciousness.

22. After the administration of the DPT vaccine, the infant, Khoua Kue, suffered loss of consciousness.

23. After the administration of the DPT vaccine, the infant, Khoua Kue, was in prolonged sleep from which it was difficult to arouse him.

24. After the administration of the DPT vaccine, the infant, Khoua Kue, suffered respiratory and cardiovascular arrest.

25. Yang Kue was properly appointed administrator of the estate of the deceased infant.

26. The petition in this case was properly completed and filed with the court.

*Recommended Conclusion of Law*

1. The petitioner properly filed a petition under 42 U.S.C.A. § 300aa–11.

2. The petitioner's son, Khoua Kue died as a result of a hypotonic-hyporesponsive collapse characterized under 42 U.S.C.A. § 300aa–14(b)(1).

3. The death of petitioner's son occurring one day after administration of the DPT vaccine, fits within the covered injuries set forth in the Vaccine Injury Table at 42 U.S.C.A. 300aa–14(a).

4. The petitioner demonstrated his case by a preponderance of the evidence required by 42 U.S.C.A. 300aa–13(a)(1)(A).

5. The respondent did not demonstrate by a preponderance of the evidence that the death was due to factors other than the vaccine as required under 42 U.S.C.A. § 300aa–13(a)(1).

6. The petitioner should be awarded compensation for a vaccine related death under 42 U.S.C.A. 300aa–15(a)(2), (b) and (e).